PENTHOUSE INTERNATIONAL, LTD.

v.

Hinson McAULIFFE.

HUSTLER MAGAZINE, INC.

v.

Hinson McAULIFFE.

HIGH SOCIETY MAGAZINE, INC.

v.

Hinson McAULIFFE.

MONTCALM PUBLISHING CORP.

v.

Hinson McAULIFFE.

EASTWAY ENTERPRISES, LTD.

v.

Hinson McAULIFFE.

Civ. A. Nos. 77–1238A, 77–1240A, 77–1268A, 77–1277A and 77–1276A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Aug. 24, 1977.

C. B. Rogers, Rogers & Hardin, Atlanta, Ga., for Hinson McAuliffe.

John Moore, Charles R. Hadaway, Atlanta, Ga., for Montcalm Pub. Co., Eastway Enterprises, Ltd. and High Society Magazine, Inc.

Herald Price Fahringer, Jr., Paul J. Cambria, Jr., Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., for Hustler Magazine, Inc.; Foy R. Devine, Fierer & Devine, Atlanta, Ga., of counsel.

James L. Paul, Gambrell & Mobley, Atlanta, Ga., for Penthouse Intern., Ltd.; Norman Roy Grutman, New York City, of counsel.

## ORDER

RICHARD C. FREEMAN, District Judge.

These are actions brought for declaratory and preliminary as well as permanent injunctive relief[1] concerning the consequences of several arrests by the Solicitor General of Fulton County, Georgia, pursuant to Ga.Code § 26–2101,[2] the Georgia

---

1. Because of the alleged temporal perishability and limited life of plaintiff's monthly publications, this court exercised its discretion under Fed.Rule 65(a)(2), Fed.R.Civ.P., and advanced the trial of this action upon the merits while consolidating it with the preliminary aspects of the action.

2. Ga.Code § 26–2101—Distributing obscene materials

(a) A person commits the offense of distributing obscene materials when he sells, lends, rents, leases, gives, advertises, publishes, exhibits or otherwise disseminates to any person any obscene material of any description, knowing the obscene nature thereof, or offers to do so, or possesses such material with the intent to do so, provided that the word "knowing," as used herein, shall be deemed to be either actual or constructive knowledge of the obscene contents of the subject matter, and a person has constructive knowledge of the obscene contents if he has knowledge of facts which would put a reasonable and prudent person on notice as to the suspect nature of the material. Provided, however, the character and reputation of the individual charged with an offense under this law, and if a commercial dissemination of obscene material is involved, the character and reputation of the business establishment involved may be placed in evidence by the defendant on the question of intent to violate this law. Undeveloped photographs, molds, printing plates and the like shall be deemed obscene notwithstanding that processing or other acts may be required to make the obscenity patent or to disseminate it.

(b) Material is obscene if:

(1) to the average person, applying contemporary community standards, taken as a whole, it predominantly appeals to the prurient interest, that is a shameful or morbid interest in nudity, sex or excretion;

(2) the material taken as a whole, lacks serious literary, artistic, political or scientific value, and

(3) the material depicts or describes, in a patently offensive way, sexual conduct specifically defined in subparagraphs (i) through (v) below:

(i) acts of sexual intercourse, heterosexual or homosexual, normal or perverted, actual or simulated;

(ii) acts of masturbation;

(iii) acts involving excretory functions or lewd exhibition of the genitals;

(iv) acts of bestiality or the fondling of sex organs of animals;

(v) sexual acts of flagellation, torture or other violence indicating a sadomasochistic sexual relationship;

(c) Additionally, any device designed or marketed as useful primarily for the stimulation of human genital organs is obscene material under this section.

(d) Material, not otherwise obscene, may be obscene under this section if the distribution thereof, or the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of their prurient appeal.

(e) It is an affirmative defense under this section that dissemination of the material was restricted to:

(1) a person associated with an institution of higher learning, either as a member of the faculty or a matriculated student, teaching or pursuing a course of study related to such material; or

obscenity statute. Plaintiffs are publishers of several monthly magazines [3] whose primary local distributor and several local retailers were arrested by agents of defendant McAuliffe between July 18, 1977 and July 29, 1977.[4] Plaintiffs' substantive claims arise under the First and Fourteenth Amendments to the United States Constitution as well as under 42 U.S.C. § 1983. The jurisdiction of this court is properly predicated upon 28 U.S.C. §§ 1331 and 1343(3).[5]

Although varying somewhat in nonessential respects, each complaint avers in essence that through a "program" of "bad faith and harassment",[6] cf. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) consisting of arrests, repeated visits to retailers, and threatening comments in the press, defendant avoided a binding adjudication among all of the allegedly injured parties concerning the obscenity vel non of the subject publications while erecting a system of prior restraint which was as insidious and effective as if the subject publications had been seized by authorities for the purpose of destruction. See Marcus v. Search Warrants of Property, etc., 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). Plaintiff Penthouse

International, Ltd. [hereinafter "Penthouse"] also moves this court for a declaration that the August, 1977 issue [7] of Penthouse is not obscene. Prior to the trial of these actions, the parties entered into several stipulations restricting the scope of the issues presently before this court. Those stipulations are: (1) that the instant plaintiffs are not presently the subject of any pending proceeding in state court; (2) that an arrestee apprehended during August, 1977, under Ga.Code § 26–2101, who has put up bond and has been released from custody would not come to trial within a six to eight week period following his arrest; (2) that a person arrested under the foregoing circumstances who remained in jail without bond would be tried within one week if a jury was available; (4) that since no criminal trials are held in Fulton County State Court during July or August of 1977, a person charged in June for violation of Ga.Code § 26–2101 would be tried in September; and (5) that the Fulton County Solicitor's office maintains no written procedures with respect to prosecutions under Ga.Code § 26–2101 and no written record concerning complaints about allegedly obscene material. Before proceeding to the merits of plaintiffs' claims, a recapitulation of the

(2) a person whose receipt of such material was authorized in writing by a licensed medical practitioner or psychiatrist.

A person convicted of distributing obscene material shall be punished as for a misdemeanor of a high and aggravated nature.

The Georgia statute substantially retraces the guidelines contained in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Accordingly, the statute is not attacked upon its face.

3. Plaintiffs are respectively: Penthouse International, Ltd., publisher of "Penthouse" magazine; Hustler Magazine, Inc., publisher of "Hustler" magazine; High Society Magazine, Inc., publisher of "High Society" magazine; Montcalm Publishing Corporation, publisher of "Gallery" magazine; and Eastway Enterprises, Ltd., publisher of "Eros" magazine.

4. Although no arrests were made concerning one of the subject publications, "Gallery" magazine, published by Eastway Enterprises, Ltd., there was testimony by Mr. Shapiro, the editor of "Gallery" that his magazine was withdrawn

from the stand at the same time when the other plaintiffs' publications were withdrawn.

5. Although several of the plaintiffs, including specifically Montcalm Publishing Corporation and Eastway Enterprises, Ltd., sell too few publications to credibly meet the $10,000 jurisdictional requirement with respect to the general federal question statute, 28 U.S.C. § 1331 it is nevertheless clear that jurisdiction is proper as to them under 28 U.S.C. § 1343(3).

6. Although plaintiff "Penthouse" cross-examined defendant McAuliffe extensively concerning his admittedly strongly held religious and moral beliefs, the parties seem to agree upon closing argument that Mr. McAuliffe's enforcement efforts were simply an attempt by him to do what he perceived to be his job in a most effective albeit arguably unconstitutional manner.

7. Under Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930), it is clear that each issue of a periodical publication such as the instant magazines are separate and distinct and must therefore be considered individually upon their respective merits.

operative surrounding factual circumstances is warranted.

Mr. McAuliffe testified that for some time prior to the making of any arrests by his office, he had received complaints from persons using Hartsfield International Airport that "obscene" materials were being vended at the airport newsstands. On July 18, 1977, Mr. Ira W. Brown, an officer from the solicitor's office, and Mr. C. A. Smith, a Fulton County Deputy Sheriff, proceeded to Hartsfield International Airport where they observed two of the nine newsstands selling "Hustler", "High Society", "Oui", "Genesis", "Playboy" and other magazines presumably of a similar character. Mr. Brown bought a "Hustler" magazine from cashier Debbie Hazelrigs and asked her for the manager's name. Ms. Hazelrigs stated that a Mr. Poss was the manager of the stand but that he was away from his desk. Mr. Brown paged Mr. Poss and waited approximately forty-five minutes for his arrival at the stand before observing two newsstand employees removing several of the subject publications from the newsstand racks. Mr. Brown then purchased copies of "Genesis", "Penthouse", and "Oui" from Ms. Hazelrigs. Mr. Poss finally was located in the concourse and was taken to his office where under questioning from Mr. Brown, he stated that he was familiar with the subject magazines but did not read them himself. Mr. Poss was then arrested without a warrant for violation of Ga.Code § 26–2101 and was transported to Fulton County Jail.

On the same day, Mr. Sidney Gordon was arrested without a warrant at Mill's Discount Drugs in Atlanta, Georgia, following a purchase by one of Mr. McAuliffe's agents of a copy of "Hustler" magazine.

On the following day, July 19, 1977, Mr. Asa Hall was arrested without a warrant at Nifty Foods in College Park, Georgia, following the sale to agents of the Solicitor General's office of copies of "Oui", "Genesis" and "High Society." On that date articles appeared in both The Atlanta Constitution and The Atlanta Journal chronicling the arrests and containing quotations from and interpretations of interviews with Solicitor McAuliffe. Ken Willis of The Atlanta Constitution testified that his article correctly quoted Mr. McAuliffe when it credited him with the statement that "[i]f they [the retail vendors] put them [the subject magazines] out for sale, we'll get them [the vendors] and whoever is involved will go to jail." Vicki Brown of The Atlanta Journal testified that Mr. McAuliffe, in the context of a telephonic interview, had suggested to her that if the arguably pornographic magazines being sold in Fulton County were not removed from the newsstands, more arrests would be made.

On July 21, 1977, Mr. Edward Elson, President of Atlanta News Agency, Inc.,[8] the primary local distributor of the subject magazines, was arrested for the sale of eight enumerated magazines: "The Best of Hustler II", the June, July and August editions of "Hustler", the June and July editions of "High Society", the August edition of "Genesis", and the August edition of "Oui."

No further arrests were made until July 27, 1977. On that date an article appeared in the morning Atlanta newspaper, The Atlanta Constitution, quoting Mr. McAuliffe as stating that "[o]bviously it . . . is working because they [the men doing the checking] haven't found anything in violation of the law." The article went on to reveal that Constitution investigators had found two newsstands still vending the subject publications: the Eastern Newsstand in Peachtree Center and the Dixie News on Decatur Street. By nightfall the proprietors of both newsstands had been arrested without a warrant for selling, respectively, a copy of "Oui" and copies of "Eros", "Men", and "Masturbation."

A final arrest of Mr. Miller Bright was made on July 29, 1977, without a warrant at

---

8. Atlanta News Agency, Inc., services between 850 and 900 retail outlets or newsstands in Fulton County and over two thousand such establishments in the greater Atlanta metropolitan area. It distributes over two thousand different publications, including the subject magazines. In addition, it employs over 275 people and operates approximately 90 trucks.

Brothers III Package and Grocery Store for the sale of "Best of Guys and Gals" and "Best of Swank." On that day, "Penthouse" and "Hustler" filed their respective actions, and, after an in chambers hearing at which allegations concerning the perishability of the subject publications were made, this court issued a temporary restraining order against defendant McAuliffe. On August 2, 1977 "High Society" filed a similarly styled action followed by "Eros" and "Gallery" on August 4, 1977. The preliminary injunction hearing was originally scheduled for August 8, 1977, but was rescheduled for August 15, 1977, due to the inability of the parties to timely complete expedited discovery. The preliminary and permanent aspects [9] of these consolidated actions were tried at a hearing commencing on August 15, 1977 and concluding on August 16, 1977. Oral argument was heard on the morning of August 17, 1977. The issues presented are now ripe for adjudication.

## STANDING

■ A threshold issue which bears mention concerns the standing of the instant plaintiff publishers to bring this action. Plaintiffs have vigorously argued that they have the type of concrete interest in the outcome of this litigation upon which the notion of standing is predicated. *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Bantam Books v. Sullivan, supra*, the

Supreme Court upheld the standing of a publisher to challenge the effective ban of its books under Rhode Island law by a "Commission to Encourage Morality in Youth". In reaching its determination, the Court reflected upon the realities of the publishing world and noted that the financial detriment which retailers suffered by removing a particular publication from their stands is smaller than either the cumulative economic effect experienced by a publisher or the cost of fighting withdrawal of the publication in court.[10] It is equally true in the instant action that plaintiffs are the most financially aggrieved parties and that they alone have the resources to vindicate the arguably infringed rights of the public and of those persons in the chain of distribution. Moreover, although the majority of the testimony of Mr. Guccione, editor and publisher of "Penthouse", and the other publishers went mostly to the allegedly irreparable nature of their injury, it is nevertheless clear that approximately eighty-two thousand[11] presently warehoused magazines which retail for between $1.50 and $2.00 per copy will lose some or all of their value[12] if they are not made available for sale shortly. Under these circumstances, we have no difficulty concluding that plaintiffs' standing has not been nor could it be successfully challenged. *Bantam Books, Inc. v. Sullivan, supra*, at 64 note 6, 83 S.Ct. 631 (1963); *see also Grandco Corp. v. Rochford*, 536 F.2d 197 (7th Cir. 1976); *Allied Artists Picture Corp. v. Alford*, 410 F.Supp. 1348 (W.D.Tenn.1976).

9. *See fn. 1, supra.*

10. Mr. Grutman, counsel for plaintiff, "Penthouse", upon oral argument equated the Solicitor's pursuit of the instant retailers to the pursuit of "Minnows" by "Jaws". The simile when examined in terms of resources which are at the disposal of the respective parties is not altogether inapposite.

11. <u>SALES FULTON COUNTY</u>

| | Annual | Highest Month |
|---|---|---|
| Hustler | 265,829 | 31,960 |
| Penthouse | 377,864 | 35,489 |
| High Society | 45,166 | 4,814 |
| Gallery | 91,104 | 9,044 |
| Eros (June, July & Aug. 1977) | 291 (3 mos.) | 109 (highest mo.) |

12. Some of the magazines which contain relatively more offensive material also contain less national advertising and therefore would appear to be injured less by the passage of their "off sales" date. Nevertheless, there was testimony by Mr. Shapiro, editor of "Gallery" and Mr. Crespo, circulation director of "High Society" that their publications bore monthly dates and that their professional opinion based upon several years experience in the magazine business, was that customers would buy a later issue and only a later issue of their magazine when two different monthly issues were sold side by side on the newsstand. Accordingly, even these magazines would lose some of their value after their "off sales" date has passed.

Accordingly, we will proceed to consider defendant's contention that this court must abstain and dismiss the instant action due to the ongoing state criminal prosecutions.

## YOUNGER v. HARRIS AND ITS PROGENY

█ Defendant has vigorously argued that the instant proceeding for declaratory and injunctive relief must be dismissed because of its potential for "interference" with the ongoing state criminal prosecutions of previously arrested retailers. Since *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) it has been clear that in certain circumstances a federal court can enjoin the enforcement of a state statute on constitutional grounds. However, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny make it clear that the scope of a federal court's intervention must be carefully limited in the interests of comity and federalism where ongoing state prosecutions are involved. Defendant's argument that the *Younger* line of cases is applicable here is somewhat anomalous in view of the stipulation that no state court proceedings are presently pending against plaintiffs. Nevertheless, defendant appears to contend that granting declaratory or injunctive relief in the instant action would "disrupt" subsequent proceedings in state court. The cases circumscribing *Younger* have limited it in two important ways without apparently making the distinction which defendant posits. First, *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), suggests that *Younger* may be avoided where there are substantial and well supported allegations that the state court proceedings are undertaken in bad faith with the purpose of harassment under, for instance, a facially unconstitutional statute.

The second and most important limitation upon *Younger* is a temporal one which provides that if there is a justiciable case or controversy which is not yet the subject of state court proceedings, federal intervention is permitted since the state has not yet chosen to act and therefore federal action could not offend notions of comity and federalism. In temporal terms, the instant action is precisely in the foregoing "post act—pre prosecution" procedural posture[13] because plaintiffs have vended the subject magazines but have not yet been prosecuted in state court for so doing.[14] In *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the Supreme Court considered the applicability of *Younger* to a situation in which plaintiff was handbilling against the Vietnam war when officers threatened him with prosecution under a Georgia statute. Eventually plaintiff's companion was arrested and plaintiff proceeded to federal court seeking a declaration that the statute was unconstitutional.[15] The Supreme Court held that there was an actual controversy sufficient to constitute possible irreparable injury and since no state court prosecution was presently pending against the plaintiff, *Younger* did not bar entry of a declaratory judgment. A similar determination was reached in *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), in the context of a prayer for injunctive relief. In *Doran*, three topless bars were shut down pursuant to a local ordinance. One bar reopened the day after it filed its federal complaint and was promptly served with a state criminal summons. The other two bars were not served with criminal process. The Court held *inter alia* that the two bars which had

---

**13.** If plaintiffs had been indicted shortly after this action had originally been filed, we concede that we would have been required to surrender jurisdiction over the action. *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). However, since no indictment insued and since the instant proceedings are now far more than embryonic, we would not surrender jurisdiction here, even if indictments were now forthcoming.

**14.** Mr. McAuliffe candidly stated in the temporary restraining order hearing of July 29, 1977, that it was his intention to eventually prosecute the editors of each of the subject magazines.

**15.** Although an injunction was originally requested in *Steffel,* the prayer was withdrawn before the action reached the Supreme Court.

not been served with criminal process could obtain preliminary injunctive relief because "the issuance of a preliminary injunction is not subject to the restrictions of *Younger* . . . In the absence of [a state criminal] proceeding, . . . a plaintiff may challenge the constitutionality of [a] state statute in federal court." *Id.* at 930, 95 S.Ct. at 2567.

*Steffel* and *Doran* also stand upon strong policy grounds which support with equal vitality the decision which we reach. In addition to the notions of comity and federalism, *Younger* was bottomed upon a presumption articulated once more in Mr. Justice Rehnquist's opinion in *Doran*,[16] that a state court is fully competent to adjudicate federal constitutional claims and should have an opportunity to do so when confronted with them through the vehicle of a state criminal proceeding. It is uncontroverted by defendant that the instant plaintiffs are not proper parties to the state criminal actions pending against their distributor and retailers and that even if they wished to interject themselves into those proceedings they could not do so. Therefore, any "interference" with the ongoing state proceedings which may flow from this action must be tolerated since the state forum is not now an adequate one in which plaintiffs may vindicate their federally secured rights. *See Judice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977).

None of the cases cited by defendant dictates a contrary result. In *Huffman v. Pursue Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), there was an ongoing state proceeding which happened to be civil or, perhaps more accurately, quasi-criminal in nature. In *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975), *rehearing denied,* 421 U.S. 1017, 95 S.Ct. 2425, 44 L.Ed.2d 686, the state court proceedings had gone well beyond the indictment stage. Likewise, in *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701

(1971), the state court proceedings had already been commenced by the filing of an information. Finally, in *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Court merely held that where plaintiff had been convicted of several violations of a state law forbidding the covering of any portion of a license plate, *Younger* did not bar purely prospective federal injunctive relief such as that which the instant plaintiffs now seek.

Defendant "Hustler" has also obliquely implied upon closing argument that plaintiff Penthouse's claim for declaratory relief might be barred by *Younger* because such a declaration would directly interfere with the state court prosecution of Mr. Poss for sale of "Penthouse." The correct response to plaintiff Hustler's suggestion is that any inconsistency in result between the instant declaratory judgment action and the state court proceedings flows not from a potential *Younger* problem but rather from anticipated inconsistent determinations reached by various potential triers of fact under the obscenity test enunciated in *Miller v. California,* 413 U.S. 15, 26 note 9, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). In any event, Mr. McAuliffe conceded upon cross examination that the weakest case of the several cases which his office had recently made was the case against Mr. Poss for the sale of "Penthouse" and that the prosecution as to that count may be declined. Since Mr. Poss' arrest was the only one involving the sale of "Penthouse", there are no ongoing state proceedings which might conceivably touch upon the issue of the alleged obscenity of the August, 1977 issue of "Penthouse" magazine. Accordingly, *Younger* is inapplicable to plaintiff Penthouse's declaratory judgment action.

In sum, the stipulation concerning the absence of any ongoing state proceedings involving the instant plaintiffs when coupled with the holdings of *Steffel v. Thompson, supra,* and *Doran v. Salem Inn, Inc.,*

---

**16.** Mr. Justice Rehnquist's opinion in *Doran* expresses justifiable concern for the havoc which permanent injunctions may reek upon proper and justifiable state action. This court realizes that its paramount duty in the instant action is to afford plaintiffs the minimum safeguards provided by our federal Constitution while intruding as little as possible upon the prerogatives of state officials.

*supra,* does not require this court to abstain and dismiss the instant actions.

## MOOTNESS

■ Defendant also suggests that two of these actions are now moot because Mr. Shapiro, editor of "Gallery" magazine, and Mr. Crespo, circulation director of "High Society" magazine, testified that their organizations would not sell the August issue of their magazines even if any possible legal impediments to such sales were removed because the "off sales" date [17] for those magazines has now passed and the September issues are awaiting distribution.

It is well settled that the power of federal courts is subject to the inherent limitations of the Article III "case or controversy" requirement and that, therefore, federal courts may resolve only justiciable or live controversies that can affect the rights of the litigants in the cases before them. *E. g., DeFunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Sosna v. State of Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Nevertheless, plaintiffs contend almost *sub silencio* that the instant circumstances fit within the judicially carved exception to the mootness doctrine because the issue and claims presented are "capable of repetition, yet evading review." *See e. g. Doe v. Bolton,* 410 U.S. 179, 187, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

The exception has been applied most often in cases involving factual circumstances in which the issues and particularly the status of the parties change periodically or are of relatively short duration. *See, e. g., Doe v. Bolton, supra; Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *McGill v. Parsons,* 532 F.2d 484 (5th Cir.

1976). The Supreme Court has articulated the doctrine in terms of a two fold test:

> (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration; and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.

*Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (emphasis added); *see also Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *In re Security Investment Properties, Inc.,* 406 F.Supp. 628, 631 (N.D.Ga.1975); *Alberta Shumate, et al. v. T. M. "Jim" Parham,* C76–838A (N.D.Ga. Feb. 22, 1977).

In the instant proceedings, there was testimony by Mr. William Marlict of Tinker, Campbell and Ewald advertising agency that magazines such as the subject publication have a life span of approximately four to five weeks. Although certain of these publications arguably have longer life spans since they have less national advertising which demands timely conveyance to the public in conjunction with major advertising campaigns, the only evidence given on the subject by Mr. Guccione and Mr. Shapiro suggested that most of the sales of these publications transpire within the first two weeks of the sales period and that all of the subject publications would be superceded and removed from the shelf within approximately thirty days from the "on sales" dates.

Moreover, Mr. McAuliffe testified that if he were not enjoined he would continue to follow the complained of procedures in the future, presumably subjecting "Gallery" and the remaining plaintiffs to precisely the same variety of injury which they allege they are presently suffering. In view of Mr. McAuliffe's testimony and the brief

---

17. Mr. Guccione, editor of "Penthouse" magazine, testified that the "on sales" or release date for the August, 1977, issue of his magazine was on or about July 15, 1977, and that the "off sales" or removal date was approximately 30 days therefrom.

period of time within which the instant issue may be litigated, we conclude that the circumstances of these actions fit within the recurring controversy exception to the mootness requirement and that the passage of the "off sales" date of "Gallery" and "High Society" magazines as well as that of the balance of plaintiffs' magazines does not render these actions moot.

## THE PROPRIETY OF EQUITABLE RELIEF—IRREPARABLE INJURY

██ Defendant has also argued before this court that we may not invoke the equitable powers with which a federal court is vested because money damages are adequate to recompense plaintiffs for the injury which they allegedly have suffered.

The propriety of granting an injunction ultimately turns upon the following traditional prerequisites to equitable relief:

(1) [success] . . . on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) . . . the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary [and permanent] injunction will not disserve the public interest.

*Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir. 1975); *see e. g., Sadler v. 218 Housing Corp.*, 417 F.Supp. 348 (N.D.Ga.1976); *Hawthorn Environmental Association v. Coleman*, D.C., 417 F.Supp. 1091, *affirmed*, 551 F.2d 1055 (5th Cir. 1977). A great deal of the testimony which was taken involves industry practices in the area of so-called "sophisticated men's magazines" and goes to the question of whether or not plaintiffs have suffered any irreparable injury. Mr.

Guccione testified that the failure of retailers to sell Penthouse magazine in the Atlanta area has pernicious effects upon the "Penthouse" organization in terms of: (1) the circulation of his publication; (2) the procurement of advertisers; and (3) the attraction of the works of nationally known writers. Mr. Guccione, Mr. Shapiro and Mr. Crespo testified that it is standard practice in the industry for the publisher to design, publish and manufacture its own magazine. At that juncture the material is forwarded to a printing company [18] for reproduction in final form. A subsidiary of the printing company typically acts as an exclusive national distributor for the magazine. Thereafter, the magazine is distributed to regional or local distributors who in turn sell the magazine to local retailers.[19] In Fulton County, the largest local distributor is Atlanta News Agency, Inc., which services approximately 850 to 900 retail outlets with about 2,000 different magazines. The next largest regional distributor is Muscogee News Company which services approximately 50 retail outlets in Fulton County.

Evidently, it is also typical in the industry for a publisher to have a written contractual agreement with the national printing and circulation companies only.[20] The national distributor in turn is responsible for dealing with a regional or local distributor. Retailers may return unsold copies of a magazine after their "off sales" date has passed and obtain refunds. The regional distributor or wholesaler in turn will destroy almost all of the unsold publications and return to the publisher for reimbursement either the covers or an affidavit as to how many magazines were destroyed. The national distributor receives a percentage of the sales price of the magazines sold at

---

**18.** "Penthouse" is printed by Curtis Printing Co. and distributed nationally by Curtis Circulating Co., a subsidiary of Caden Industries.

**20.** Copies of plaintiffs' agreements with their respective national distributors are now a part of this record.

**19.** DISTRIBUTION CHAIN FOR "HUSTLER" MAGAZINE

the end of the month. However, several subsequent reconciliations are made at various times up to one year after the "off sales" date when a final reconciliation is made. In any event, credible testimony given before this court suggests that plaintiffs as a group lost approximately $180,000.00 on sales of the August issues of their magazines, which will be born respectively by the publishers (50%), the national distributors (10%), the wholesalers (20%) and the Atlanta retailers (20%).

Revenue also flows in part from international, national, and regional advertising as well as from sales. Mr. Guccione testified that "Penthouse," which is produced on a regional basis in five or six distribution areas across the United States and Canada, has approximately 700 advertisers and charges about $32,000 per full page advertisement. The cost per page of advertising is in turn directly related to the magazine's circulation as it is measured by the "Audit Bureau of Circulation".[21] If circulation drops below a guaranteed level, the magazine must rebate a percentage of the unfulfilled guarantee to advertisers. Mr. Guccione testified that the effect of rebate was not felt merely in terms of lost revenue but also entailed adverse psychological effects in readership and advertiser interest which may flow from reports of diminished circulation. Mr. Erwin E. Billman, executive vice president and chief operating officer of "Penthouse" testified that diminished circulation would harm a magazine's "credibility" in the distribution field and result in loss of chain store sales. In addition, Mr. Billman stated that the loss of fifty-five to sixty thousand anticipated sales of the August, 1977 issue of Penthouse in the Atlanta market would have a significant yet unquantifiable adverse effect upon Penthouse's circulation figures. Finally, Mr. George Loin, President of Creamer F.S.R., a large national advertising firm which now represents "Penthouse", testified that if the approximately 720,000 sales of Penthouse made per year in Fulton County were not made this year, the effect upon Penthouse's ability to obtain national advertising could be "devastating." While defendant sought to impeach several of plaintiffs' witnesses with respect to some of plaintiffs' publications which have less national advertising, the only direct evidence which was presented upon the subject in the form of testimony by Mr. Shapiro and Mr. Crespo suggested that the remaining plaintiffs would also be adversely effected to some degree.

Moreover, Mr. Guccione testified that if the circulation of "Penthouse" fell or it was adjudicated obscene,[22] the magazine's credibility and ability to attract national writers would be substantially impeded. Finally, the perishability of the subject publications, coupled with the cost of their storage and the economic unfeasability of transferring them from one to another location for retail sale, weighs heavily in favor of invoking the equitable jurisdiction of this court. In sum, since the likelihood is great that plaintiffs will jointly and severally suffer substantial irreparable injury in the areas of circulation, attraction of advertising, and possibly even editorial content, as a result of defendant's actions, we conclude that this court should consider plaintiffs' claims upon their respective merits.

## PRIOR RESTRAINT

The gravamen of plaintiffs' argument is that through systematic visits to plaintiffs' Atlanta retailers, widespread public announcements, and a "program" of carefully timed warrantless arrests, defendant accomplished a "constructive seizure" of plaintiffs' publications without first affording plaintiffs or the public any opportunity to have the propriety of the seizures scrutinized by a "neutral and detached magistrate not involved in the competitive busi-

---

**21.** Apparently "sophisticated men's magazines" are favored somewhat by advertisers because most of their sales occur over the counter where the likelihood of actual readership is greater than the subscription sales, and because "pass along" readership by nonpurchasers is quite high.

**22.** The putative obscenity of "Penthouse" is a question which must be addressed in another context upon its merit. *See infra* pages 1256–1257.

ness of law enforcement." *Coolidge v. New Hampshire,* 403 U.S. 443, 453, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

The constitutional guideposts upon the road of plaintiffs' argument are few. However, the factual basis upon which plaintiffs' argument is predicated is well developed and bears careful scrutiny. The propriety of the application of plaintiffs' abstract premise to the circumstances of the actions *sub judice* is a question which turns ultimately upon the issues of: (1) whether or not the withdrawal of the subject publications from the Atlanta market was voluntary; and (2) whether or not there was a constructive seizure of those materials within the meaning of *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), *Bantam Books v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) and *Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973).

On July 18, 1977 agents of Mr. McAuliffe made two arrests. The next day one more arrest was made and an article appeared in The Atlanta Constitution containing a comment by Mr. McAuliffe which made it clear that any one selling the subject publications was subject to arrest. Ms. Jean Ferguson, manager of Elson's Arcade in the Peachtree Plaza Hotel testified that on or about July 19, 1977, a man came to her store and identified himself as being from the Fulton County Solicitor's office. He then showed Ms. Ferguson pertinent portions of a copy of "Oui" magazine taken from the newsstand in Elson's Arcade and asked her if she knew what she was selling.[23] She expressed her distaste for portions of the magazine and said that she had not known what it contained. The man then tried to purchase the magazine from Ms. Ferguson and, when she refused to sell it to him, commented that she was "lucky" that she

had not elected to sell it. Ms. Ferguson further testified that two men with badges visited her later the same day and specifically asked for a copy of "Hustler" magazine. However, prior to the second visit, Ms. Ferguson had taken all of the subject magazines off of the stand due to her fear of arrest. Ms. Ferguson culminated her testimony by stating that she had never been in trouble with law enforcement officials and that she felt harassed by the three officers who had come to her store on the day in question.

Mr. Glen Terry Brock, owner of West End News, and President of Atlanta Science Fiction Conference, testified that he had removed all of the subject magazines from his racks on the evening of July 18, 1977, in an attempt to comply with what he perceived to be the enforcement effort of the solicitor's office. On the morning of July 19, 1977, officer Smith and Mr. Ira Brown from the solicitor's office visited Mr. Brock's store and commented that Mr. Brock was "a lucky son of a gun" because none of the subject magazines which would have subjected him to arrest were on the rack. In addition, the officers allegedly threatened Mr. Brock with arrest if he moved "Playboy" magazine closer to the sales counter.

Mr. Charles M. Roberts, a former staff sergeant, editor of an army newspaper, and A.B.C. television employee testified that he heard about the arrests on the radio and pulled all of the subject publications off his rack leaving only "Playboy" in their place.[24] He then called the solicitor's office in an attempt to obtain some sort of guidelines concerning the publications which might subject him to arrest but was given no such information. Rather he was told to "get a lawyer" and a copy of Ga.Code § 26–2101, the obscenity statute.[25]

---

**23.** While this inquiry might be interpreted as a friendly gesture, it also might be interpreted as an attempt either to restrain the sale of the subject publication or to obtain evidence of scienter necessary for a criminal prosecution.

**24.** Mr. McAuliffe testified that his officers made the decision as to which magazines were obscene pursuant to the general legal instruc-

tions given by him. In addition, he stated when showed a copy of the August, 1977 issue of "Playboy" that in his opinion persons selling "Playboy" were not immune from arrest for its sale and it was probably no more than coincidence that a vendor of "Playboy" had not been arrested.

**25.** *See* fn. 2, *supra.*

On July 21, 1977, Mr. Edward Elson was arrested and charged with eight counts of violating Ga.Code § 26–2101. Mr. Elson's Atlanta News Agency, Inc. services approximately 90% of the approximately 1,000 retail outlets in Fulton County, Georgia. In addition, Mr. Elson's firm employs over 275 people and operates approximately 90 trucks. The next largest wholesale distributor, Muscogee News Agency, has approximately four trucks and services about 50 local retailers. Other wholesale distributors have a negligible impact upon the Atlanta market.[26] After Mr. Elson's arrest, Atlanta News Agency refused to sell plaintiffs' magazines.[27]

Plaintiffs' national distributors fulfilled their contractual obligation to plaintiffs by approaching other local wholesale distributors in an attempt to have them distribute plaintiff's magazines. There was a good deal of testimony by Mr. McCoy, chief financial officer of Atlanta News Agency which suggested that other wholesalers would have had almost insurmountable difficulties in assuming Atlanta News Agency, Inc.'s role because of the lack of resources and computer technology necessary to adequately service 900 retail news operations. In any event, the remaining wholesalers declined to assume distribution rights to plaintiffs' publications.

No more arrests occurred until an article appeared in the Atlanta Constitution on the morning of July 27, 1977, in which it was suggested that the "crackdown" had been almost completely effective in driving the subject publications off the stand save for two stands which had been observed by Atlanta Constitution reporters vending some of plaintiffs' publications. By the evening of July 27, the proprietors of both stands had been arrested.

Mr. McAuliffe admitted to some extent upon cross examination that retail dealers in plaintiffs' magazines were different in kind from owners of "yellow front" bookstores in that plaintiffs' retailers deal in a variety of clearly nonobscene material and are more fearful of the specter of arrest than those more familiar with the threat. Mr. Harrod of Magic Markets, a large southeastern convenience store chain and a principal retailer of "Penthouse" stated that he received several calls from managers concerned about the possibility of arrest and decided on balance that the potential problem was too great to warrant continued sale of "Penthouse" in the Fulton County area. Nevertheless, Mr. McAuliffe averred that he did not foresee that plaintiffs' publications would be withdrawn from local newsstands and characterized their withdrawal as a "side effect" of the arrests which did not flow from any intention to harass.[28] Regardless of what Mr. McAuliffe states to be his subjective good faith intentions, the clear weight of the evidence demonstrates that removal of plaintiffs' publications from the newsstands in Fulton County, Georgia, on or before July 29, 1977, was not voluntary. Accordingly, we must

---

**26.** For example, Southern News has a single truck and employs four or five persons.

**27.** Mr. Elson did not testify, possibly because the defendant who had subpoenaed him, believed that he could not help their case and plaintiffs did not wish to further embarrass him. Nevertheless, Mr. McCoy, chief financial officer of Atlanta News Agency, stated that his firm was no longer vending plaintiffs magazine and would not do so until this action was decided.

**28.** Mr. McAuliffe strains credulity by asserting that he did not know what effects would flow from the subject arrests. Moreover, it is arguable that if seven arrests had been made on the same day the effect thereof would have been

less pernicious and stifling of plaintiffs First Amendment rights than the "arrest-a-few—then-wait-and-see" approach which was pursued by the Solicitor's office. While this court cannot be the final arbitor of Mr. McAuliffe's subjective good faith or bad faith, it is clear that the actions of the Solicitor's office were in fact viewed as harassment by retailers and had the effect of removing plaintiffs' publications from the stands. Cf. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Therefore, the maximum number and timing of arrests which defendant could legally have made before impinging upon plaintiffs' First Amendment rights and the First Amendment rights of the public is not a question with which we must deal. Accordingly, we decline to do so.

proceed to determine the constitutional consequences of the removal and to some degree the proper parameters of official authority in the area of First Amendment protection.

■ While the law in this area is far from clear, the solicitor's office appears to have been laboring under several basic constitutional misconceptions. First, Mr. Hadaway, defendant's counsel, argued in essence that the only First Amendment rights in issue were those of the distributor and retailers and that those rights could have been adequately vindicated in the state court proceedings. This view overlooks the First Amendment right of the publisher, see *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); and, most importantly, of the people. *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972) (The First Amendment was not intended merely to shield persons engaged in newspaper work from unwarranted governmental harassment but rather was intended to serve the larger purpose of protecting public access to information). *Firestone v. Time, Inc.*, 460 F.2d 712 (5th Cir. 1972), cert. denied, 409 U.S. 875, 93 S.Ct. 120, 34 L.Ed.2d 127 (The immunity conferred by the First Amendment in favor of a publication is designed more for protection of the public generally than it is for the publisher himself); *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971).

Second, there is substantial evidence that defendant believes that he or his agents may properly make the initial determination concerning the obscenity of any material and may make an arrest without a warrant for the sale of the subject material. Mr. Rhodes, an attorney in the solicitor's office, voiced this view but failed to adequately answer the question of who would protect the public's presumptive right of access to the material. In addition, Mr.

McAuliffe suggested upon deposition that obscene material is "contraband"[29] and may be seized accordingly. Apparently, Mr. McAuliffe's misconception flows from the tautology articulated by Mr. Hadaway that while First Amendment material is protected, obscene material is not within the First Amendment and therefore may render its seller subject to arrest without a warrant. As plaintiffs contend, this position stands the First Amendment upon its head by placing the burden of proving nonobscenity upon the seller. Courts have uniformly rejected any such attempt to undermine First Amendment guarantees. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *New York Times Co. v. United States, supra; Bantam Books v. Sullivan, supra.*

■ Moreover, it is precisely because the object of Mr. McAuliffe's seizure was of *presumptively protected* First Amendment material, see *Cinema Classics Limited v. Burch*, 339 F.Supp. 43 (C.D.Cal.1972), affirmed, 409 U.S. 807, 93 S.Ct. 105, 34 L.Ed.2d 66, that greater procedural safeguards must be afforded before seizure, or "constructive seizure", can be countenanced. *Roaden v. Kentucky, supra.* As several courts have noted, a fundamental purpose of the First Amendment is to foreclose governmental control or manipulation of the sentiments uttered to the public. *Main Road v. Aytch*, 522 F.2d 1080 (3rd Cir. 1975), *Cox v. State of Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) rehearing denied, 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 814, *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). Therefore, before presumptively protected material is involuntarily removed from the market place by governmental activity which arguably is not directed toward that end, competing private and public policy interests must be carefully balanced in light

---

**29.** Possibly Mr. McAuliffe derived this interpretation from Ga.Code, § 26–2104 which states that:

Any materials declared to be obscene by provisions of this Chapter and advertisements for such materials are hereby declared to be contraband.

of all the circumstances. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

■ It is clear in the first instance that courts must look through form to substance in determining whether a system of informal censorship has been formulated. *Allied Artists Picture Corp. v. Alford*, 410 F.Supp. 1348 (W.D.Tenn.1976); *Bantam Books v. Sullivan, supra.* If a system of prior restraint is found, it comes before this court bearing a heavy presumption against its constitutional validity. *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930); *Lovell v. City of Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); *Schneider v. New Jersey*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Plaintiffs argue on the basis of *Heller v. New York, supra; Bantam Books v. Sullivan, supra*; and *Roaden v. Kentucky, supra*, that the Fulton County Solicitor's office has put in place such a system.

In *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), Rhode Island law had created a "Commission to Encourage Morality in Youth" which expressed opinions to retailers concerning the obscenity of certain publications with the nominal purpose of preventing youthful readers from being exposed to those publications. Finding that no procedures were provided before the publication was listed by the Commission and noting that the *effect* of listing a publication with the Commission was to completely suppress the subject publication, the Court held that the Rhode Island scheme violated the Fourteenth Amendment.

In *Heller v. New York*, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), the Court held that an adversary hearing was not required before authorities could seize a single copy of an allegedly obscene film as evidence in a criminal prosecution. However, the Court relied upon the fact that a

threshold determination of obscenity had been made by a neutral and detached magistrate before the film was seized and the arrest of the theatre manager was made. In addition, the Court observed that a prompt post-seizure judicial resolution of the obscenity issue at the request of an interested party was vital to the constitutionality of the seizure.

Finally, in *Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973), the Court held that seizure of a film which was being exhibited to the general public without authority of a constitutionally sufficient warrant created a form of prior restraint which rendered the seizure unreasonable under the Fourth Amendment to the United States Constitution.

■ Taken together, *Bantam Books, Heller*, and *Roaden* [30] appear to stand for the proposition that before state officials may undertake a *series* of warrantless arrests which generate reasonably foreseeable *effects* in terms of removing presumptively protected speech from the public eye, judicial intervention of some dimension is constitutionally required.

■ Plaintiffs argue that a full blown adversary hearing is required before an arrest under Ga.Code § 26–2101 may be made because the limited life span of the instant publications renders virtually any prior restraint a final restraint. *Cf. United States v. Thirty Seven Photographs*, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *Teitel Film Corp. v. Cusack*, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968). We are initially of the opinion that such an adversary hearing would unduly impede the valid functions of law enforcement officials by requiring them to in effect conduct a "mini-trial" upon the merits before being allowed to arrest a party who arguably has been apprehended in the act of violating Ga.Code § 26–2101. However, we are not called upon to make this decision because it is not entirely clear that a speedy post-arrest adversary hearing upon the question of ob-

---

**30.** Certainly *Roaden's* Fourth Amendment underpinnings make it distinguishable from the instant action. Nevertheless, the very heart of plaintiffs' argument is found in the notion that

the series of arrests made by the defendant had the *effect* of constructively seizing subject publications without a warrant.

scenity would have been inadequate to vindicate plaintiff's rights. *Heller v. New York, supra.* Rather, we conclude simply that defendant did not comport with the certain *minimum* constitutional requirement of obtaining a warrant from a neutral and detached magistrate based upon a threshold determination of obscenity before making a *series* of arrests, the effect of which was to create a system of prior restraint with respect to plaintiffs' publications. Moreover, we are not persuaded that the harm to defendant will outweigh the harm to plaintiff or that the public interest will be harmed by granting plaintiffs' certain carefully limited injunctive relief. *See Morgan v. Fletcher,* 518 F.2d 236 (5th Cir. 1975). In this context it should be noted that we do not decide that Mr. McAuliffe's office may make no more arrests under Ga.Code § 26–2101 concerning subsequent issues of the subject publications. Rather, we decide only that if he chooses to do so he must follow the previously enunciated constitutional guidelines.

In sum, we conclude that the August issues of plaintiffs' magazines have been subjected to an informal system of prior restraint, *Bantam Books v. Sullivan, supra,* and that injunctive and declaratory relief directed against this system is appropriate.

However, to avoid any untoward interference with legitimate state interests we will limit the parameters of the injunctive relief awarded to the specific facts of this action. Only in the area of declaratory relief should this opinion be construed so as to provide somewhat broader guidelines which will henceforth circumscribe the authority of the solicitor's office to make wholesale arrests, the effect of which is to put in place an informal system of prior restraint. Accordingly, without expressing any opinion as to the number of arrests which may constitute a prior restraint, we hereby DECLARE that defendant McAuliffe's enforcement activities under color of Ga.Code

§ 26–2101, consisting of numerous and harassing arrests with or without a warrant prior to a final adjudication upon the issue of obscenity *vel non* at an adversary hearing constitutes a prior restraint violative of the First and Fourteenth Amendments to the United States Constitution. Moreover, defendant McAuliffe is hereby PERMANENTLY ENJOINED from making further arrests under Ga.Code § 26–2101 for the sale of the August issues of plaintiffs' publications without first obtaining arrest warrants.[31]

## OBSCENITY VEL NON

■ "Penthouse" is the sole plaintiff which has chosen to address the obscenity issue head on and has prayed for a declaration that the August 1977 issue of "Penthouse" is not obscene. It is uncontested that "Penthouse" must be evaluated by the standard set out in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) and substantially parroted in Ga.Code § 26–2101.[32] Of course, every element of the foregoing test must be met before a publication may be adjudicated obscene. *Id.*

While this court initially had substantial reservations about acting as a trier of fact where the applicable yardstick is one calibrated in terms of "contemporary community standards", it appears that the Supreme Court and lesser federal courts have not differentiated obscenity from other substantive areas and have adhered to the usual parameters of the Seventh Amendment by holding that a judge may act as a finder of fact in civil proceedings involving obscenity. *Alexander v. Virginia,* 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973); *Star v. Preller,* 375 F.Supp. 1093 (D.C.Md. 1974), *affirmed,* 419 U.S. 956, 95 S.Ct. 217, 42 L.Ed.2d 173; *United Artists Corp. v. Harris,* 363 F.Supp. 857 (W.D.Okl.1973). Such a result seems particularly appropriate here where all the evidence and argument was directed to the third prong of *Miller* which does not speak of contempo-

---

**31.** While this court's jurisdiction over the instant publications is limited to a single issue thereof, *see Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930), it is hoped that as Mr. Justice Harlan suggested in *Bantam*

*Books v. Sullivan,* 372 U.S. 58, 76, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), a word to the wise will be sufficient.

**32.** *See* fn. 2, *supra.*

rary community standards but rather requires only a determination as to "whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value." *Id.* 413 U.S. at 24, 93 S.Ct. at 2615. Members of the Supreme Court have suggested that this prong of *Miller* is essentially a major check upon the jury function which must be reviewed with care. *See Jenkins v. Georgia*, 418 U.S. 153, 164, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (Brennan, Stewart and Marshall concurring); *see also Roaden v. Kentucky, supra.* As we have already stated, the arrest procedures which were employed by Mr. McAuliffe's staff were constitutionally deficient because they failed to provide for a threshold determination of obscenity by a neutral magistrate. However, "Penthouse" also made a convincing showing that defendant and his agents did not properly apply the *Miller* test by considering the work in question "as a whole." Rather, Mr. Brown, who made the sole arrest involving "Penthouse" testified upon deposition that he was an average to poor reader who "looked largely at the pictures" and that he examined three magazines concerning which arrests were made, including "Penthouse", for a total of five minutes before exercising the discretion with which he perceived himself to be vested by making a warrantless arrest for the sale of the subject publications. A more complete examination of the August 1977 issue of "Penthouse" is required before a decision may be made as to whether or not on balance "the work, taken as a whole, lacks serious literary, artistic, political or scientific value." *Miller v. California, supra*, 413 U.S. at 25, 93 S.Ct. at 2615.

Mr. Guccione, editor of "Penthouse", testified that he had received awards from Brandeis University as "Publisher of the Year" and from Columbia University School of Journalism. In addition, Mr. Guccione stated that he had been invited to speak before audiences at Harvard, Yale, Wharton School of Finance and the American Bar Association concerning his financial and journalistic efforts. Moreover, Mr. Guccione testified that "Penthouse" often included articles by Harrison Salsburg, Nicholas Von Hoffman, Philip Roth, Norman Mailer and Tad Szulc, and that the August, 1977 issue of "Penthouse" was "representative." Mr. Guccione was particularly proud of the article entitled "The Spy Who Came in From the Newsroom" which revealed for the first time in print that Copley Press had twenty-three intelligence agents masquerading as reporters on its payroll.

In addition, the August, 1977 issue of "Penthouse" contains a number of articles of significant literary value including: (1) The Strange Case of the Missing Special Prosecutor; (2) a potpourri section containing "The Politican as Magician," "Vietnam on the Boards", film reviews, book reviews, and movie reviews; (3) "The Blue Jeaning of Eastern Europe", a piece concerning the westernization of Eastern European Youth; (4) "Is Man Born to Kill", a "New Look at Evil", an article about man's innate propensity for violence; (5) "The Vietnam Veterans Adviser"; (6) "Scoring Your Smarts"; (7) "White On", an article about light liquors; (8) "The Clean Machine", a review of the new Toyota Corolla liftback; and (9) "Winning Through Eccentricity" a view of how to progress up through the organizational hierarchy. While there are sections of "Penthouse" which exhibit less literary value and taste, we believe that on balance it cannot be said that the August, 1977 issue of "Penthouse", "taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 25, 93 S.Ct. at 2615. Any conflict which may potentially exist between our view of the August 1977 issue of "Penthouse" and that of a jury in a state criminal proceeding is one which is traceable solely to the multitude of fact finders provided for under *Miller v. California, supra.* However, since prosecution of Mr. Poss in state court for sale of the August, 1977 issue of "Penthouse" evidently has been declined, no conflict should in fact exist. Accordingly, it is hereby DECLARED that the August, 1977 issue of "Penthouse" magazine is not obscene within the meaning of *Miller v. California, supra,* and Ga.Code § 26–2101.

IT IS SO ORDERED.