PENTHOUSE INTERNATIONAL, LTD.

v.

Hinson McAULIFFE.

PLAYBOY ENTERPRISES, INC.

v.

Hinson McAULIFFE.

PLAYBOY PUBLICATIONS, INC.

v.

Hinson McAULIFFE.

Civ. A. Nos. 77–1974A, 77–1998A
and 77–1999A.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 7, 1978.

James L. Paul, Gambrell & Mobley, Atlanta, Ga., Norman Roy Grutman, Eaton, Van Winkel, Greenspoon & Grutman, New York City, for plaintiff in Civ. A. No. 77–1974A.

Warren C. Fortson, Smith, Cohen, Ringel, Kohler & Martin, Atlanta, Ga., Neil H. Adelman, Devoe, Shadur & Krupp, Chicago, Ill., for plaintiffs in Civ. A. Nos. 77–1998A, 77–1999A.

Leonard W. Rhodes, Asst. Sol. Gen., State Court of Fulton County, Atlanta, Ga., for defendant.

## ORDER

RICHARD C. FREEMAN, District Judge.

█ These are actions brought for declaratory and preliminary as well as permanent injunctive relief[1] concerning the consequences of the arrest of Atlanta magazine retailer Albert Battle and the issuance of accusations against the corporate and individual publishers of plaintiffs' respective publications.[2] In each instance, the Solicitor of Fulton County, Georgia, contended that the parties in question had violated the Georgia obscenity statute, Ga.Code § 26–2101[3] by vending obscene material in Fulton County, Georgia. The substantive federal claims which plaintiffs presently bring before this court arise under the First and Fourteenth Amendments to the United States Constitution as well as under 42 U.S.C. § 1983. The jurisdiction of this

1. Because of the alleged temporal perishability and limited life span of plaintiffs' monthly publications, this court exercised its discretion under Fed. Rule 65(a)(2), Fed.R.Civ.P., and advanced the trial of this action upon the merits while consolidating it with the preliminary aspects of this action.

2. Accusations have been issued by the Fulton County Solicitor's office against Robert Guccione and plaintiff Penthouse International, Ltd., the publishers of Penthouse Magazine, Daniel Filipacchi and plaintiff Playboy Publication, Inc., the copublisher and publisher of Oui Magazine, and Hugh Hefner and plaintiff Playboy Enterprises, Inc., the publishers of Playboy Magazine.

3. Ga.Code § 26–2101 provides as follows:

(a) A person commits the offense of distributing obscene materials when he sells, lends, rents, leases, gives, advertises, publishes, exhibits or otherwise disseminates to any person any obscene material of any description, knowing the obscene nature thereof, or offers to do so, or possesses such material with the intent to do so, provided that the word "knowing," as used herein, shall be deemed to be either actual or constructive knowledge of the obscene contents of the subject matter, and a person has constructive knowledge of the obscene contents if he has knowledge of facts which would put a reasonable and prudent person on notice as to the suspect nature of the material. Provided, however, the character and reputation of the individual charged with an offense under this law, and if a commercial dissemination of obscene material is involved, the material character and reputation of the business establishment involved may be placed in evidence by the defendant on the question of intent to violate this law. Undeveloped photographs, molds, printing plates and the like shall be deemed obscene notwithstanding that processing or other acts may be required to make the obscenity patent or to disseminate it.

(b) Material is obscene if:

(1) to the average person, applying contemporary community standards, taken as a whole, it predominantly appeals to the prurient interest, that is a shameful or morbid interest in nudity, sex or excretion;

(2) the material taken as a whole, lacks serious literary, artistic, political or scientific value, and

(3) the material depicts or describes, in a patently offensive way, sexual conduct specifically defined in subparagraphs (i) through (v) below:

(i) acts of sexual intercourse, heterosexual or homosexual, normal or perverted, actual or simulated;

(ii) acts of masturbation;

(iii) acts involving excretory functions or lewd exhibition of the genitals;

(iv) acts of bestiality or the fondling of sex organs of animals;

(v) sexual acts of flagellation, torture or other violence indicating a sadomasochistic sexual relationship;

(c) Additionally, any device designed or marketed as useful primarily for the stimulation of human genital organs is obscene material under this section.

(d) Material, not otherwise obscene, may be obscene under this section if the distribution thereof, or the offer to do so, or the possession with the intent to do so is a commercial exploitation of erotica solely for the sake of their prurient appeal.

(e) It is an affirmative defense under this section that dissemination of the material was restricted to:

(1) a person associated with an institution of higher learning, either as a member of the faculty or a matriculated student, teaching or pursuing a course of study related to such material; or

court is properly predicated upon 28 U.S.C. § 1331 and 1343(3).

Each plaintiff's complaint raises two similar if not identical claims. First, each plaintiff seeks declaratory and injunctive relief with respect to what it contends are unconstitutional procedures followed by the Solicitor's office which have resulted in the commencement of improper criminal proceedings against the publishers and in the imposition of a prior restraint against their publications. Second, each plaintiff seeks a declaration that several monthly issues of the respective publications are not obscene within the meaning of the constitutional standards enunciated in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and subsequently codified in Ga. Code § 26–2101.[4] Before proceeding to the merits of plaintiffs' claims, a recapitulation of the history of litigation between these parties as well as the operative facts presently before this court is warranted.

In late July of last year, an action filed in this court by Penthouse International Ltd. and several other publishers not parties to the instant action against defendant McAuliffe. *Penthouse International, Ltd., et al. v. McAuliffe*, 436 F.Supp. 1241 (N.D.Ga. 1977) [hereinafter "*Penthouse I*"]. In that action, the federal plaintiffs argued that through a series of eight carefully timed arrests coupled with repeated threatening visits to retailers and threatening comments in the press, defendant avoided a binding adjudication among all of the allegedly injured parties concerning the obscenity *vel non* of the subject publications while erecting a system of prior restraint which effec-

tively eliminated the availability of plaintiffs' publications in the Fulton County area. *Id.* at 1244. The evidence in that action clearly demonstrated that in each instance no arrest warrant based upon probable cause and issued by a neutral and detached magistrate, *see Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), was obtained before the arrest was made. Rather, the arresting officer himself made the determination that the subject material, which was presumptively protected by the First Amendment, *Cinema Classic Limited v. Burch*, 339 F.Supp. 43 (C.D.Cal.), *aff'd*, 409 U.S. 807, 93 S.Ct. 105, 34 L.Ed.2d 66 (1972), was obscene and therefore that the vendor could be arrested for committing the offense of vending obscene material in the presence of the officer. In our order of August 24, 1977, we agreed with plaintiffs that their magazines had been "constructively seized", *see Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973), *Sokolic v. Ryan*, 304 F.Supp. 213 (S.D.Ga.1969); *Delta Book Distributors v. Cronvich, Inc.*, 304 F.Supp. 662 (E.D.La.1969) (three-judge court); *Cambist Films, Inc. v. State of Illinois*, 292 F.Supp. 185 (N.D.Ill.1968) [numerous arrests chilling further sales and creating a prior restraint], from the newsstand by the series of arrests effected without any threshold judicial intervention. Accordingly, we declared that defendant McAuliffe's enforcement activities under color of Ga. Code § 26–2101, consisting of numerous and harassing arrests with or without a warrant prior to a final adjudication upon the issue of obscenity *vel non* at an adversary hear-

(2) a person whose receipt of such material was authorized in writing by a licensed medical practitioner or psychiatrist.

A person convicted of distributing obscene material shall be punished as for a misdemeanor of a high and aggravated nature.

4. More specifically, plaintiffs seek: (1) a declaration that several of their monthly issues are not obscene; (2) a declaratory judgment that the Georgia obscenity statute may not be applied constitutionally to future issues of plaintiffs' magazines which have the same general editorial content as the December, 1977 through June 1978 issues; (3) a declaratory judgment that defendant's method of applying

Ga.Code § 26–2101 is unconstitutional because it fails to consider the magazine as a whole; (4) a permanent injunction requiring a prior adversary hearing and a determination of obscenity before any arrest for the sale of one of plaintiffs' monthly issues may be made in the future; (5) a permanent injunction prohibiting defendant from going forward with the pending prosecutions against Battle, Guccione, Filipacchi and Hefner; and (6) and a permanent injunction requiring defendant to notify and not to object to plaintiffs' appearance in any post-arrest preliminary hearing concerning one of plaintiffs' future publications.

ing constituted a prior restraint violative of the First and Fourteenth Amendments to the United States Constitution, *Penthouse International, Ltd. v. McAuliffe, supra* at 1256. We also ruled that the August, 1977 issue of Penthouse magazine was not obscene within the meaning of *Miller v. California, supra* and Ga.Code § 26–2101, and permanently enjoined defendant from making further arrests for the sale of the August, 1977 issue of any of the subject publications without first obtaining arrest warrants. The stage was then set for the further theatrics which have given rise to this litigation.

On August 25, 1977, defendant McAuliffe telephoned J. Kirk Quillian, an attorney who represents Atlanta News Agency,[5] and informed Quillian that he considered the September, 1977 issue of Penthouse to be obscene. On August 26, 1977, at Mr. Quillian's suggestion, McAuliffe agreed to submit the subject magazine informally to Judge Daniel Duke of the State Court of Fulton County arguably in order to determine: (1) whether it was obscene or whether it could properly be distributed; and (2) whether its distribution would violate Judge Duke's probationary order entered with respect to Atlanta News Agency after its plea of *nolo contendere* to obscenity charges on August 23, 1977. Judge Duke advised Mr. McAuliffe and Mr. Quillian that, taken as a whole, he did not consider the September "Penthouse" to be obscene.

Thereafter, between December 8 and 13, 1977, Mr. Quillian and Mr. McAuliffe candidly discussed ways to expeditiously obtain a resolution of the obscenity issue with respect to publications vended by Atlanta News without subjecting Mr. Edward Elson, President of Atlanta News Agency, to further arrests.[6] Defendant McAuliffe indicated that he would give Quillian notice if he were about to arrest someone for the sale of a magazine known to be distributed by Atlanta News. In addition, Mr. McAuliffe and Quillian discussed a "stripped down" state court declaratory judgment procedure whereby an arguably obscene magazine could be taken to a Superior Court judge and if it was ruled obscene Atlanta News would not sell it. Conversely, if the judge ruled that it was not obscene, Mr. McAuliffe would not arrest for its sale. However, the parties could not agree on Mr. McAuliffe's suggestion that the procedure would entail no expert testimony and no appellate rights. In addition, Judge Sam Phillips McKenzie of the Fulton Superior Court advised the parties that there were no adequate procedures to deal with the contemplated plan and that he did not believe that the judges of that court would look favorably upon an attempt to create some. Accordingly, no procedure was ever agreed upon.[7]

On November 23, 1977, Mr. Leonard Rhodes from Mr. McAuliffe's office took copies of several magazines purchased by investigator Hartley to the chambers of Chief Judge Camp of the State Court of Fulton County. On the same day, Mr. McAuliffe's office telephoned Mr. Quillian and told him that a purchase had been made of the December Penthouse which Mr. McAuliffe

---

5. Atlanta News Agency is the Regional Distributor or Wholesaler who distributes to newsstands, book stores and other "retail customers" or retailers between 90 and 98% of all of the magazines so vended in Fulton County, Georgia. *See Penthouse International Ltd. v. McAuliffe*, 436 F.Supp. 1241 nn. 8, 19 (N.D.Ga. 1977).

6. Mr. Elson had been arrested in July, 1977 on eight counts of vending obscene material. At the hearing of this action, he testified that he was embarrassed both professionally and socially by this arrest and that he would do "anything" to avoid being arrested again. Unfortunately, the "notice system" *infra* which was

devised by Quillian and McAuliffe was patently unconstitutional because it bartered away the rights of the publishers, *see Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); and the public, *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972) in favor of Mr. Elson's peace of mind.

7. As we observed upon the trial of this action, the proposed system was merely an abortive attempt to pare down due process safeguards and decide the obscenity *vel non* of plaintiffs' publications without plaintiffs' presence.

considered to be obscene. Quillian was pledged to keep this information confidential.[8] On November 30, six John Doe arrest warrants were issued in connection with the sale of "Chic", "Playboy", "Oui", "Raw Lust", "Hustler" and "Penthouse" and Albert Battle was arrested. Quillian was given notice of the arrests. Battle's attorney waived a preliminary hearing on December 1, 1977. The next day Leonard Rhodes notified Quillian of the waiver and that Mr. McAuliffe's office considered the waiver to be an initial determination that the magazine was obscene. It is unclear when during the period the accusations were issued against the instant plaintiffs and Guccione, Filipacchi and Hefner. In any event, Quillian told Elson of the conversation and Elson ordered Atlanta News to immediately "pick up" from their retailers all of the December issues of the subject publications. During the period of December 6, through December 8, 1977, defendant McAuliffe and Mr. Rhodes had conversations with Quillian concerning the arguable obscenity of the January issues of plaintiff's publications. However, on December 9, 1977, this action was filed and defendant McAuliffe agreed to make no further arrests until the issues herein presented were decided.

Although expedited discovery was granted and this court remained ready to hear this action at several junctures, the parties could not resolve pre-trial disputes until early May. The action was then heard on May 17 and 18, 1978, and post-trial briefs were filed, the last of which was received by this court on June 26, 1978. The issues presented finally appear ripe for adjudication.

## STANDING

■ Defendant has argued that plaintiffs do not have standing to complain about the prosecution of Albert Battle, apparently because such a right is personal to Mr. Battle. This argument misconstrues plaintiffs' position. The gravamen of the publishers' contentions is that Battle's arrest had a consti-

tutionally impermissible *effect* upon the sale and distribution of their magazines. Without expressing any view at this juncture as to the merits of this claim, it is clear that plaintiffs have a concrete interest in litigating this action, *see Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), because they "are the most financially aggrieved parties and they alone have the resources to vindicate the arguably infringed rights of the public and those persons in the chain of distribution." *Penthouse International, Ltd. v. McAuliffe, supra* at 1246; *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Grandco Corp. v. Rochford*, 536 F.2d 197 (7th Cir. 1976); *Allied Artists Picture Corp. v. Alford*, 410 F.Supp. 1348 (W.D.Tenn. 1976). Therefore, we conclude once more that plaintiffs have adequate standing to pursue this action. Accordingly, we must proceed to the troublesome and intractable abstention question.

## YOUNGER v. HARRIS AND ITS PROGENY

■ As in *Penthouse I*, defendant has vigorously contended that the instant proceeding for injunctive and declaratory relief must be dismissed due to its potential for interference with ongoing state criminal prosecutions. While it is clear that under the proper circumstances a federal court may enjoin the enforcement of a state statute on constitutional grounds, *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it is equally clear that such intervention must be carefully limited in the interests of comity and federalism. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The teaching of *Younger* is, at least in part, that the state and its courts have a peculiarly strong interest in the enforcement of their criminal laws. Accordingly, the circumstances under which federal intervention is permitted are narrow and evidently only two in number.

---

8. It is arguable, of course, that Mr. McAuliffe was merely endeavoring to comply with *Penthouse I* by keeping "threatening" comments out of the press.

The first limitation upon *Younger* permits federal intervention in the limited time frame after there is a case or controversy because the arguably illegal act has been committed but before state authorities have exercised their innate powers by commencing a criminal prosecution. *See Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) [plaintiff's handbilling companion was arrested and plaintiff was threatened with arrest before bringing a federal declaratory suit]; *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) [one bar owner who reopened after being closed under a local ordinance was immediately arrested and two other similarly situated owners brought a federal declaratory suit]. This "temporal" exception does not apply to the magazine issues involved in Mr. Battle's arrest as it did in *Penthouse I* because in this instance, state authorities have already chosen to exercise their law enforcement powers by bringing criminal proceedings against the plaintiff publishers as well as the local retailers. Accordingly, plaintiffs are relegated to proving their compliance with the second *Younger* exception as a precondition to proceeding to the merits of their prior restraint arguments.

In *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the federal plaintiffs were successful in obtaining an injunction against their prosecution in state court for violation of the Louisiana Subversive Activities and Communist Control Law. Noting that the statutes were unconstitutionally overbroad upon their face, the Supreme Court stated that federal intervention was warranted where state authorities were engaged in "bad faith-harassment" or where other "exceptional circumstances" existed. *See Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) [federal intervention proper where statute was facially unconstitutional and the federal plaintiff was being arrested virtually daily for the same crime without taking any additional affirmative action]. Plaintiffs have enumerated a plethora of defendant's actions which they contend constitute bad faith and harassment, the most important of which include: (1) carefully "structuring" the criminal proceedings in effect to avoid an adjudication of the obscenity of plaintiffs' publications; (2) defendant McAuliffe's failure adequately to supervise and direct his subordinates; (3) "judge shopping"; and (4) that Mr. McAuliffe has incorrectly and unconstitutionally interpreted the "taken as a whole" standard articulated in *Miller v. California, supra* and Ga.Code § 26–2101. These contentions will be addressed *seriatim*.

Plaintiff's first contention is that by issuing accusations with plaintiffs' publications "sandwiched" between "hard core" publications such as "Raw Lust" and "Chic" in a single count, it is possible that the criminal charges can be tried and a guilty verdict obtained based solely upon the obscenity of the hard core publications. The evidence given by Mr. Michael Clutter, Mr. Battle's attorney, suggested that he wished to keep publications like "Playboy", "Oui" and "Penthouse" in a criminal charge because of their palliative effect upon a jury and that he and most other local criminal counsel typically waived a preliminary hearing in order to avoid dismissal of the charges as to those publications. In addition, a paralegal employed by one plaintiff examined Fulton County Court records and found that the single count procedure followed by defendant McAuliffe was mainly peculiar to plaintiffs' cases. Defendant McAuliffe in turn testified that under Georgia law the trial judge had the discretion to sever publications within a single count for the purpose of determining guilt or innocence as to the sale of each publication and that it is arguable that only one transaction is involved in the simultaneous sale of several purportedly obscene magazines so that only one accusation is permissible for each multi-magazine sale.

While plaintiffs' evidence might be persuasive on the bad faith issue in the abstract or under different circumstances, plaintiffs have completely neglected the fact that they are parties to state criminal proceedings where the obscenity *vel non* of

the same issues of plaintiffs' publication involved in Mr. Battle's prosecution may be litigated. Moreover, since plaintiffs may only be prosecuted for purveying the magazines which they publish, no "hard core" publications would distract a state court jury's attention from the alleged obscenity *vel non* of "Playboy", "Oui" or "Penthouse." Likewise, if Judge Camp failed to follow the proper procedures in issuing a warrant, his failure can be raised by challenging the adequacy of the warrant in state court. State courts are presumed competent to deal with the same federal constitutional questions which may be presented here, *Doran v. Salem Inn, Inc., supra,* and it is assumed that those rights can normally be vindicated in criminal proceedings. *Younger v. Harris, supra; Grandco Corp. v. Rochford, supra.* Moreover, if plaintiffs have deliberately bypassed an available adequate state remedy to litigate here, it is arguable that their complaint lacks equity or irreparable injury sufficient to warrant federal injunctive relief. *cf. Milky Way Productions v. Leary,* 305 F.Supp. 288 (S.D.N.Y.1969) (three-judge court), *aff'd,* 397 U.S. 98, 90 S.Ct. 817, 25 L.Ed.2d 78 (1970); *Universal Amusement Co., Inc. v. Vance,* 559 F.2d 1286 (5th Cir. 1977). Independent of this notion, however, we believe that the form of the state court charge as to Mr. Battle has little relationship to the ability of plaintiffs to vindicate their federal constitutional rights in their own state court actions. Accordingly, we will proceed to consider plaintiffs' other allegations of bad faith.

■ Plaintiffs' next two contentions [9] concerning failure to train and supervise subordinates and judge shopping are strictly relevant only if the state court judge failed to follow normal criminal practice and the mandate of our order of August 24, 1977. Put another way, if Judge Camp

followed the proper standards and warrant procedures, the fact that he was singled out for warrant submission or that Mr. McAuliffe's subordinates were not adequately versed on the finer points of obscenity law is essentially irrelevant because a "neutral and detached magistrate" not engaged in the competitive business of law enforcement, *Coolidge v. New Hampshire, supra,* will have been interposed between Mr. McAuliffe and plaintiffs.

■ Unfortunately, the record as to the standards and mode of scrutiny of the subject publications employed by Judge Camp in issuing the subject warrants is entirely unclear. In an affidavit apparently executed at the suggestion of plaintiffs, Judge Camp indicated that he perused all six magazines for about thirty-five minutes, looking mainly at the pictures, and spent little time reading the lengthy articles. In a subsequently executed affidavit, Judge Camp revised his estimates and characterized his review as more plenary and thorough. Accordingly, a factual dispute as to the adequacy of Judge Camp's review remains even after trial of this action.[10] Although either party could have called Judge Camp to testify in person, neither party elected to do so. Because *inter alia* the nature of Judge Camp's review is not entirely clear, a brief summary of the judge shopping and supervision evidence is warranted.

■ Credible evidence showed that Judge Camp was the sole judge to whom defendant tendered warrant applications, arguably because his views concerning obscenity are more congruent with those of defendant McAuliffe than are the views of the other judges in the State Court of Fulton County.[11] In addition, the evidence showed that two of the investigators in Mr. McAuliffe's office had an inadequate under-

---

9. Plaintiffs' final contention is more appropriately considered during a discussion of the obscenity *vel non* issue *infra.*

10. It is of course presumed with good legal reason that all judges know the law and for practical reasons that no judge would appreciate being viewed over a period of time as a

"warrant doormat" for any governmental prosecutor.

11. For instance, Judge Duke evidently refused a warrant application for an issue of Penthouse upon which Judge Camp was prepared to issue a warrant.

standing of the *Miller* test articulated in Ga.Code § 26–2101. John E. Segars, who is a law school graduate, testified that he really did not think about what any of the operational language in the statute meant upon purchasing several issues of the subject magazines. Likewise, James D. Hartley of Mr. McAuliffe's office stated that he simply picked up the specified magazines and delivered them to superiors who tendered them to Judge Camp.

Defendant McAuliffe argued in turn that the selection of Judge Camp was based solely upon his availability due to his position of Chief Judge and the lighter case load attendant thereto. In addition, Mr. McAuliffe stated that his investigators were given verbal instructions and were required to carry a synopsis of this court's order of August 24, 1977 with them at all times.

Even if we accept the views of the foregoing evidence in a light most favorable to plaintiffs, it is not clear that bad faith-harassment has been made out. Bad faith-harassment has most often been found where there is a facially unconstitutional statute, *Dombrowski v. Pfister, supra,* or where there have been repeated prosecutions none of which have resulted in a conviction, *Krahm v. Graham,* 461 F.2d 703 (9th Cir. 1972) [nearly 100 criminal charges still pending where eleven cases had been tried and none had resulted in conviction]; *Granco Corp. v. Rochford, supra,* [intervention improper where some of 100 prosecutions had resulted in convictions]. Similarly, intervention has been countenanced where it is beyond reproach that there was no conduct arguably within the ambit of the statute or the prosecution had absolutely no hope of obtaining a valid conviction. *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1970). Because there is initially no "track record" in the State Court of Fulton County concerning the obscenity of the subject magazines, it is difficult if not impossible to say that further attempts at this juncture to prosecute plaintiffs constitute bad faith-harassment.

Perhaps more dramatic is what the evidence does not show. There is no indication as there was in August that Mr. McAuliffe's agents have repeatedly visited plaintiffs' local retailers. In addition, there is no evidence that Mr. McAuliffe has "rattled his saber" in the newspapers or that any series of arrests has been undertaken or contemplated. In essence, then, there is no evidence of violation of this court's previous order and little evidence of "bad faith-harassment." However, it is arguable that there are "exceptional circumstances" warranting federal injunctive relief including: (1) the continuing nature of this controversy; (2) the possibility of further arrests; and (3) the unique marketing situation in Fulton County, Georgia. The last of these bears some elaboration.

Atlanta News Agency services approximately 850 to 900 of the 950 retail magazine outlets in Fulton County, Georgia with about 2,000 different magazines. *Penthouse International Ltd. v. McAuliffe; supra* at 1250. In performing this service, Atlanta News employs 275 people and 90 trucks as well as computer facilities. *Id.* at 1245 n.8. Mr. Elson, President of Atlanta News, testified at the hearing of this action that his organization controls approximately 98% of the retail newsstand magazine market in Atlanta. In fact, it has come to the attention of this court, although it was never entirely explained during trial, that Atlanta News has entered into a consent decree with respect to its future market conduct in Fulton County, Georgia and several other areas. Therefore, the unusual marketing situation in Fulton County hopefully will be of limited duration. Nevertheless, the effect of Mr. Elson's control over the Atlanta market has been to preclude the entry into the market of "marginal risk takers" who might be willing to vend the subject magazines in the face of an arguable one in 900 chance of being arrested. Instead, the evidence demonstrated that when the slightest possibility of an arrest emerges, Mr. Elson simply removes all of the subject magazines from the stands, effectively eliminating them from the Fulton County market.

Plaintiffs have once more argued in the abstract that they and Mr. Elson should not be denied federal injunctive relief and thereby be placed "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [they] believe to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel v. Thompson, supra* 415 U.S. at 462, 94 S.Ct. at 1217. However, plaintiffs neglect to note that they are already enmeshed in such a proceeding. Moreover, defendant has argued with equal vigor that the risk of a single arrest is one which plaintiffs and Mr. Elson should bear. *Younger v. Harris, supra.* Both abstract arguments do little to resolve the instant dispute.

▇▇▇▇▇▇ However, assuming *arguendo* that the showing of "bad faith-harassment" and "exceptional circumstances" made by plaintiffs were sufficient to permit plaintiffs to proceed to the merits of the prior restraint issue, we still would be compelled to rule that no relief was appropriate because there is no defect of a constitutional dimension in the procedure delineated by our order of August 24, 1977. The sole discernible challenge leveled by plaintiffs is that defendant should be required to hold a full blown adversary hearing on the obscenity *vel non* issue at which at least a preponderance of the evidence standard would be employed before an arrest could be made as to any of plaintiffs' publications. This proposal has been uniformly rejected by the courts. In *Milky Way Productions v. Leary, supra,* publishers of weekly and bi-weekly publications argued that a prior adversary hearing was necessary before they could be arrested because of the chilling effect upon others of such an arrest. Judge Frankel, writing for the three-judge panel, held *inter alia* : (1) that the "chilling effect" of a prior adversary hearing could be as great or greater than that of an arrest;

(2) that such a hearing procedure could be used indiscriminately to increase First Amendment barriers; and (3) that the onset of the criminal process provided the state court defendants with additional procedural safeguards which were constitutionally sufficient to protect the federal plaintiffs' rights. Other courts have reasoned similarly, *Golden Eagle v. Johnson,* 493 F.2d 1179 (9th Cir. 1974); or held *inter alia* that prior adversary hearings normally are an unnecessary and overbroad impingement upon the ordinary methods of initiating criminal proceedings. *Mouldings, Inc. v. Potter,* 465 F.2d 1101 (5th Cir. 1972); *Krahm v. Graham, supra.* Accordingly, we believe that the requirement of a prior adversary hearing is not warranted where *inter alia* a speedy trial is available in state court. Rather than avail themselves of such a speedy trial specifically offered by defendant McAuliffe, plaintiffs resisted extradition and came to this court complaining of an alleged lack of an adequate forum. A federal plaintiff may not bypass the opportunity for a hearing and then complain of its absence. *Universal Amusement Co. v. Vance, supra.* Mr. Grutman, counsel for Penthouse, stood before this court in Penthouse I and in his most dulcet tones clearly stated that he and Mr. Guccione would travel anywhere at any time to vindicate the worth of their magazine. Evidently when the travel entails a criminal prosecution rather than a civil action, an election which the state is entitled to make, *Younger v. Harris, supra,* Mr. Guccione has more difficulty obtaining reservations. In any event, we believe that the requirement of a prior adversary hearing has been rejected in parallel cases and is not warranted in this action.[12] Accordingly, we conclude that even if bad faith-harassment or exceptional circumstances sufficient to warrant federal injunctive relief had been shown, the requested relief of an adversary hearing is inappropriate.[13] Moreover, with respect

12. To the extent that a contrary result may be suggested by *Universal Amusement Co. v. Vance,* 559 F.2d 1286 (5th Cir. 1977), under Texas and federal law, when a "seizure" occurs, we find that there is insufficient evidence

of any "seizure" in this action. *See* note 13 *infra.*

13. Plaintiffs have also moved this court to devise guidelines for the future which will prevent the recurring nature of this litigation. The

to enjoining the criminal proceedings in state court, we conclude that an insufficient showing of bad faith-harassment or clearly meritless prosecution has been made. *See Krahm v. Graham, supra; Grandco Corp. v. Rochford, supra; Perez v. Ledesma, supra.* If a defect in the manner in which the warrants were *in fact* issued exists, that contention should be raised as a defense in the criminal prosecution. The evidence presented on that question here was just inconclusive. However, our conclusion simply pretermits consideration of any matters concerning the December issues of plaintiffs' magazines. It does not necessarily preclude the consideration of the obscenity *vel non* question with respect to subsequent issues of plaintiffs' magazines.

## OBSCENITY VEL NON

▇▇▇ With respect to the January issue of plaintiffs' publications, there was testimony given *inter alia* by Mr. Quillian that notice of their probable obscenity had been given by Mr. Rhodes in Mr. McAuliffe's office and that true to form a prosecution probably would have proceeded had not this action intervened.[14] In the context of plaintiffs' January issues then, a case or controversy exists, *Baker v. Carr, supra,* and the "temporal" post-act, pre-prosecution exception to *Younger* applies, *see Steffel v. Thompson, supra; Doran v. Salem Inn, Inc., supra.* No untoward interference with the state court proceedings could result because no January issue of plaintiffs' publications is involved there. However, the prior restraint issue is not properly presented here by the January issues be-

cause the magazines were actually vended in Fulton County pursuant to the agreement with Mr. McAuliffe and the allegedly unconstitutional procedures which plaintiffs attempted to attack were never applied to plaintiffs' January issues. *Cf. Midway Youth Football Ladies Auxiliary, Inc. v. Strickland,* 449 F.Supp. 418 (N.D.Ga.1978) (Freeman, J.); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Therefore, solely the obscenity *vel non* issue is left for decision. However, in order to reach that conclusion we must determine that the sale of the January issue of the subject magazines does not posit a moot question.

▇▇▇ In *Penthouse I* we noted that the power of this court was limited by Article III of the United States Constitution to justiciable or live controversies, *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Sosna v. State of Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), but that a judicially carved exception to the mootness doctrine applied when a claim was capable of repetition yet evading review. *See e. g., Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The doctrine typically is employed when:

> The challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration; and (2) there [is] a reasonable expectation that some com-

---

obscenity *vel non* section of this order should help create some meeting of the minds upon that question. With respect to the arguable "prior restraint" question, plaintiffs and Mr. Elson should look for a remedy *inter se* rather than for a judicial remedy when, as here, it is arguable that their claim is the product of collusion, *e. g.,* plaintiffs' resistance to available state court procedures and their institution of this action coupled with Elson's removal of the subject magazines. *Cf. Septum, Inc. v. Robert E. Keller,* C.A. No. 77–1476A (N.D.Ga. Sept. 16, 1977) (O'Kelley, J.). Although this situation may not be collusive in the strict sense of being agreed upon between plaintiffs and defendant,

it nevertheless has the odor of contrivance about it. *See* note 5 *supra.*

14. No issue after January, 1978 will be examined because no threat of prosecution sufficient to create a case or controversy has been made as to those issues. Of course plaintiffs bear the burden as well as the benefit of the teaching of *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930), that each issue of their magazines presents a discrete obscenity question. For that same reason, prospective injunctive relief as to the obscenity *vel non* of plaintiffs publications is inappropriate.

plaining party would be subjected to the same action again.

*Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975); *In re Security Investment Properties, Inc.*, 406 F.Supp. 628 (N.D.Ga.1975); *Alberta Shumate, et al. v. T. M. "Jim" Parham*, C76–838A (N.D.Ga., Feb. 22, 1977). The evidence in this action, as in *Penthouse I*, demonstrated: (1) that the "life" of an issue of one of plaintiffs' magazines is relatively short, approximately one month; and (2) that the alleged obscenity *vel non* of plaintiffs' publications may well rise again in this district. Accordingly, we conclude that the arguable obscenity of the January issues of plaintiffs' publications presents a live justiciable controversy. The parties presented a number of witnesses who sought to flesh out the skeletal standards enunciated in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)[15] and Ga.Code § 26–2101. Of course every element of the foregoing test must be met before a publication may be adjudicated obscene.

Professor Rubin, who testified on behalf of Penthouse, had impressive academic and literary credentials but his testimony was somewhat perfunctory and he gave the court little concrete data upon which his testimony was based except his perceptions about authors who appeared in several issues of "Penthouse." Dr. Clark, a licensed clinical psychologist, lost his credibility by insisting that "Raw Lust" and "Bamboo" (a publication consisting solely of pictures of bondage and masochism) might have significant scientific or therapeutic value. Likewise, defendant's experts, Dr. Fred Orr Crawford and Dr. Jo Cooley, who testified by deposition, were not particularly persuasive because they assumed virtually an absolutist position by contending that there was virtually nothing of value in plaintiffs' magazines.

The expert who was most persuasive and descriptive with respect to the specifics upon which his opinion was based was Dr. Ernest van den Haugg, a visiting professor of criminal justice and an adjunct professor of law at the University of Buffalo. In addition to having a law degree and an undergraduate degree in sociology and economics, Dr. van den Haugg, is a fully qualified psychoanalyst. Although he had testified previously in six to twelve obscenity cases, he had in each previous instance testified for the prosecution against *inter alia*: Screw magazine and the motion pictures, The Devil and Miss Jones, Behind the Green Door and Deep Throat.

In *Penthouse I* we expressed reservations about acting as a trier of fact where the applicable yardstick is one calibrated in terms of "contemporary community standards" but observed that the Supreme Court and lower federal courts have not differentiated obscenity from other substantive areas and have adhered to the usual parameters of the Seventh Amendment by holding that a judge may act as a finder of fact in civil proceedings involving obscenity. *Alexander v. Virginia*, 413 U.S. 836, 93 S.Ct. 2803, 37 L.Ed.2d 993 (1973); *Star v. Preller*, 375 F.Supp. 1093 (C.D.Md.), aff'd, 419 U.S. 956, 95 S.Ct. 217, 42 L.Ed.2d 173 (1974); *United Artists Corp. v. Harris*, 363 F.Supp. 857 (W.D.Okl.1973). Dr. van den Haugg testified that the leading criterion of community standards in terms of religious, ethical and moral matters was community size. In larger metropolitan areas of over one-half million population there generally is a higher proportion of young adults and a rapid rate of environmental and attitudinal change. These factors tend to lead to a somewhat more liberal view of sex and obscenity than generally prevails in smaller population areas.

15. The standard articulated in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) is as follows:

The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, . . . . ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Id.* at 24, 93 S.Ct. at 2615.

With respect to the balance of the *Miller* criteria, Dr. van den Haugg testified that "Oui" did not appeal to the prurient interest in sex, that is, to the shameful or morbid interest in sex, because the pictorial sections neither depicted excretion nor in most instances "focused" upon the genitals. Rather, he believed that the pictorial portions, although not always in the best of taste, generally promoted a *healthy, normal* interest in sex. Likewise, he stated that "Oui" was not patently offensive because the pictorial portions generally did not depict "acts." Rather, in the vast majority of instances, the models appeared alone without partners with whom they could engage in concerted activity. In the latter two respects, Dr. van den Haugg contrasted "Chic" in which the photographs focused on or revolved around the genital area and models repeatedly appeared engaged in obviously concerted sexual "acts" with partners. *See e. g., United States v. Pellegrino,* 467 F.2d 41 (9th Cir. 1972); *Hunt v. Keriakos,* 428 F.2d 606 (1st Cir.), *cert. denied,* 400 U.S. 929, 91 S.Ct. 185, 27 L.Ed.2d 189 (1970)). While we agree generally with the probity of some of the criteria offered by Dr. van den Haugg, we feel obligated to supplement his analysis.

The third prong of *Miller,* "whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value," *id.* 413 U.S. at 24, 93 S.Ct. at 2615, appears to represent essentially a check upon the previous two elements. *See Jenkins v. Georgia,* 418 U.S. 153, 164, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (Brennan, Stewart and Marshall, concurring); *see also Roaden v. Kentucky, supra.* Moreover, the "taken as a whole" language in the first and third prongs of *Miller* appears to be designed to eliminate segmented review of a book or magazine when on balance the redeeming features of the work outweigh any of its arguably obscene portions.

Solicitor McAuliffe has argued that the "taken as a whole" test was devised to apply to "works" and that when a magazine which typically is an eclectic publication containing several seemingly unrelated pieces tied together only by a central approach or theme is perused, discrete works within the magazine may be "taken as a whole" and may independently be adjudged obscene. In support of this position, Mr. McAuliffe refers the court to famous footnote seven of *Miller* which cites with approval the statement in *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972), that "[a] quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication." Defendant McAuliffe's position is clearly incorrect.

First, the "taken as a whole" standard of *Miller* is not really new, *see Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and simply reflects in essence the practical fact that an arguably obscene book or magazine is going to be published or banned as a discrete unit. It is practically impossible and legally impermissible for defendant McAuliffe to tiptoe through each and every "Playboy", "Oui" and "Penthouse" vended in Fulton County, scissors in hand, and to excise those portions of the magazine thought to be obscene. A magazine is a "whole" within the meaning of *Miller* and it must be judged as such.

After carefully examining the January issues of "Playboy", "Penthouse" and "Oui", we conclude: (1) that each magazine individually taken as a whole does not encourage a shameful or morbid, rather than a healthy interest in sex; and (2) that the material in each magazine is not patently offensive because it rarely depicts conduct or "acts." Moreover, we found that the January issues of "Playboy", "Penthouse", and "Oui" have serious literary, artistic, political and scientific value.

For instance, the January issue of "Playboy" contained *inter alia* : (1) an interview with Jean-Paul Sartre; (2) "The Eleventh Hour Santa", a piece on last minute Christmas shopping ideas; (3) "Alex Haley's Candid Conversations", a reprint of the former Playboy interviewer's conversations with public figures such as Miles Davis, Cassius

Clay, Malcolm X, Martin Luther King, Jr., and George Lincoln Rockwell; (4) a four article series concerning "Movie Making, Seventies Style" and (5) "Doctor Fast", a fiction piece by Erich Segal.

Likewise, the January, 1978 issue of Penthouse contained *inter alia:* (1) "Cartergate III" an article about the power and policies of United States Foreign affairs adviser Zbigniew Brzezinski; (2) "Africa, Jimmy Carter's Vietnam" by noted author Tad Szulc; (3) "The Vietnam Veteran's Advisor"; (4) "Improving Perfection"; a review of the 1978 Volvo 262C; and (5) "Why Carter Has To Give Away The Panama Canal In Order To Sell Out Taiwan" by Nicholas Von Hoffman.

Finally, the January, 1978 issue of "Oui" contains *inter alia* : (1) "Taking on the Censors", an article concerning obscenity and the First Amendment; (2) an interview with Jacqueline Bisset; (3) "The Fright Report" in which author Stephen King comments upon his works; (4) "Cult T.V.", a piece about television shows that have remained popular long after their demise, and (5) "Hey Kids, Lets Rent The Old Barn And Plan An Invasion of Haiti", a spoof on revolutionary tactics and notions.

■ In sum then, we conclude that the January, 1978 editions of "Playboy", "Penthouse", and "Oui" have significant literary, artistic, political and scientific value which, independent of any other determinations which we have made, precludes finding them obscene. Any conflict between this view and that of a jury in a state criminal proceeding is one which is not necessarily irreconcilable but rather traceable solely to the multitude of fact finders provided for under *Miller v. California, supra; Penthouse International, Ltd. v. McAuliffe, supra* at 1257. While defendant McAuliffe is not required to agree with this construction, we say once again, hopefully for the last time, that he is obligated to view magazines "as a whole" in the future.

■ Accordingly, for the reasons hereinabove expressed, it is hereby DECLARED: (1) that Mr. McAuliffe must apply the Georgia obscenity statute, Ga.Code § 26–2101 so as to consider magazines and other printed material "as a whole"; and (2) that the January, 1978 issues of "Playboy", "Penthouse" and "Oui" are not obscene within the meaning of *Miller v. California, supra,* and Ga.Code § 26–2101.[16] In all other respects, plaintiffs' claims for declaratory and injunctive relief are hereby DENIED.

IT IS SO ORDERED.

---

16. In deciding that *injunctive* relief is not warranted against defendant McAuliffe's construction of the taken as a whole language of *Miller* and Ga.Code § 26–2101, we, of course, employ the standard in this circuit:

> (1) [success] . . . on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) . . . the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) granting the preliminary [and permanent] injunction will not disserve the public interest.

*Morgan v. Fletcher,* 518 F.2d 236 (5th Cir. 1975); *Sadler v. 218 Housing Corp.,* 417 F.Supp. 348 (N.D.Ga.1976); *Hawthorn Environmental Association v. Coleman,* 417 F.Supp. 1091 (N.D.Ga.), *aff'd,* 551 F.2d 1055 (5th Cir. 1977). Because, under our previous order, a magistrate will make the initial obscenity determination, it is difficult to say that plaintiffs have or will suffer irreparable injury as a result of Mr. McAuliffe's improper construction. Moreover, it would be improper to convert every attempted enforcement by defendant McAuliffe of § 26–2101 into an arguable contempt proceeding under this order. Nevertheless, the possibility that Mr. McAuliffe's view could be disseminated to *inter alia* magistrates and judges warrants declaratory relief to correct the misconception.