**PENTHOUSE INTERNATIONAL, LTD., Plaintiff,**

v.

**James L. WEBB, Individually, and as Solicitor General for the County of Fulton, State of Georgia, Defendant.**

**Civ. A. No. C84–1769A.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 14, 1984.

As Corrected Sept. 18, 1984.

James L. Paul, Gary A. Barnes, Atlanta, Ga., Norman Roy Grutman, New York City, for plaintiff.

Charles S. Hunter, Asst. Sol. Gen., Fulton County, Atlanta, Ga., for defendant.

ORDER

SHOOB, District Judge.

## I. INTRODUCTION

This is an action under 42 U.S.C. § 1983 for declaratory and injunctive relief as well as for damages. Plaintiff, publisher of the monthly magazine "Penthouse," alleges that James Webb, Solicitor General of Fulton County, has wrongfully brought accusations against plaintiff and Elson's News and Gift Shops, Inc., a distributor of Penthouse, for violation of the Georgia obscenity distribution statute, O.C.Ga.Ann. § 16–12–80, in the distribution of the September 1984 issue of Penthouse, and has thus violated plaintiff's rights under the first and fourteenth amendments to the United States Constitution. Plaintiff seeks a permanent injunction against enforcement of O.C.Ga.Ann. § 16–12–80 with respect to distribution of the September 1984 issue of Penthouse; a declaration that the accusation filed against plaintiff is null and void; a declaration that the September 1984 issue of Penthouse is not obscene and is protected by the first and fourteenth amendments to the U.S. Constitution; a declaration that the actions of Webb and his agents are in bad faith and violate plaintiff's rights under the first and fourteenth amendments; a declaration that the statute authorizing service of a criminal accusation upon a corporation, O.C.Ga.Ann. § 17–7–92, is unconstitutional as applied to plaintiff; dam-

ages; and attorney's fees under 42 U.S.C. § 1988.

Plaintiff has applied for a temporary restraining order to enjoin the arrest of any person for distribution of the September or October 1984 issues of Penthouse and to prevent the enforcement of the obscenity distribution statute with regard to those issues. The Court held a hearing on the application on September 4 and 5, 1984. Because counsel for both parties were present, the Court treats the application as being for a preliminary injunction under Rule 65(a), Fed.R.Civ.P., and hereby enters its findings and conclusions as required by Rule 52, Fed.R.Civ.P.[1]

## II. FACTUAL BACKGROUND

On August 8, 1984, two investigators of the Solicitor General's office purchased a copy of the September 1984 Penthouse from a newsstand owned by Elson's News and Gift Shops, Inc. The investigators went before a magistrate of Fulton County and obtained two "Jane Doe" arrest warrants against the salesperson based upon a determination that the issue was probably obscene within the meaning of O.C.Ga.Ann. § 16-12-80(b). Solicitor General Webb then filed accusations in the State Court of Fulton County against plaintiff and against Elson's News and Gift Shops.

Penthouse is a nationally distributed magazine styling itself "the international magazine for men." It has a world-wide circulation of 5 million. Plaintiff distributes the magazine through Curtis Circulation Company, which selects wholesalers in different areas of the United States.[2] Plaintiff derives revenue both from sale of the issues and from advertising; advertising income itself depends upon circulation,

because advertisement prices rise and fall with the number of readers reached.

Approximately 500 wholesalers distribute Penthouse throughout the country. Sixth largest of these wholesalers is Atlanta News Agency, Inc. ("ANA"). ANA controls 98 percent of the periodical distribution market in the Atlanta metropolitan area and in Savannah, which is Georgia's second largest city. Both ANA and Elson's News and Gift Shops are owned or controlled by Atlantan Edward E. Elson.

Upon the filing of an accusation against Elson's News and Gifts, Inc., Mr. Elson caused ANA to cease distributing copies of the September 1984 Penthouse. Elson also informed Penthouse that ANA would not distribute the October 1984 issue because of the fear of arrest and prosecution.[3]

Elson testified that no threat has been expressed to him, his companies, or any employees concerning distribution of the October 1984 issue of Penthouse. His decision not to distribute that issue was based upon business reasons and upon his knowledge of the history of litigation between him and the former Solicitor General of Fulton County over sexually oriented publications. Elson stated that he feared to distribute the October 1984 issue because of the controversy over the September 1984 issue; in his view—derived from information or complaints generated by others, and not from personal observation—there has been no significant change in the content of Penthouse over the last ten years. In his words, the prosecution for the September issue amounts to a threat of prosecution for the October issue.

Elson also testified that, owing to the size and complexity of its distribution network, ANA cannot screen individual issues

---

1. Because the Court conducted a hearing on short notice and received limited evidence, it will entertain a further motion at a later date if plaintiff has evidence that would substantially alter the Court's preliminary impressions.

2. Although no testimony addressed this point, it is clear from exhibits that plaintiff also engages directly in the sale of magazines on a subscription basis.

3. Elson also unsuccessfully demanded that plaintiff, which has claimed that the accusation against it was void because of problems of service, submit itself to jurisdiction of the State Court of Fulton County so that the Solicitor General and Penthouse could dispute the question of obscenity without the issue being litigated indirectly and at ANA's expense.

of the 2800 different periodicals it handles. ANA is unable to intercept even the most extremely obscene issues; instead it depends upon the reliability and credibility of the publishers and distributors with whom it deals.

Elson estimated that there are approximately 500 retailers of Penthouse in Fulton County. Penthouse sales account for 4.8 percent of ANA's gross revenues, although the percentage of revenues derived from Penthouse sales within Fulton County was not specified.

Elson testified that an interruption of ANA's distribution of Penthouse causes a loss of credibility with retailers, who expect regular distribution. He also testified that an accusation impairs ANA's ability to do business because of the stigma attached to criminal prosecution for distribution of obscene materials. Elson stated that municipal governments and large hotel chains dealing with ANA and Elson's other companies are concerned with the distributor's reputation and that the reputation is harmed by such an accusation.

Plaintiff's chief financial officer, Mr. Prebich, testified that the publisher loses revenue when part of the distribution system fails to operate. Although Curtis Circulation Company, not the publisher, deals directly with wholesalers, Mr. Prebich estimated that it would be difficult for Curtis to find a new distributor to replace ANA. Mr. Prebich also testified that an accusation such as that filed in Fulton County impairs the publisher's relations with advertisers who are sensitive to the magazine's image, but he could not cite any problems with advertisers over the current accusation.

Plaintiff called to the Court's attention a history of litigation between it and Hinson McAuliffe, defendant's predecessor in office, over alleged obscenity of various issues of Penthouse and of a film, *Caligula*, distributed by plaintiff. In *Penthouse International, Ltd. v. McAuliffe*, 436 F.Supp. 1241 (N.D.Ga.1977) (*Penthouse I*), Judge Freeman of this court found that the conduct of McAuliffe, "consisting of numerous

and harassing arrests with or without a warrant prior to a final adjudication upon the issue of obscenity *vel non* at an adversary hearing," constituted a prior restraint forbidden by the first and fourteenth amendments. 436 F.Supp. at 1256. The court also declared that the August 1977 issue of Penthouse was not obscene according to the standards of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). 436 F.Supp. at 1257.

In a separate case, *Penthouse International, Ltd. v. McAuliffe*, 454 F.Supp. 289 (N.D.Ga.1978) (*Penthouse II*), the court, again acting through Judge Freeman, considered plaintiff's challenge to a state court accusation against it. The court found that no bad-faith harassment or clearly meritless prosecution had been shown, and it denied declaratory and injunctive relief with regard to an accusation against the December 1977 issue that was commenced before Penthouse's suit was filed. The court stated that the principles of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), precluded interference by a federal court with a state court proceeding, and therefore it refused to determine the question of obscenity of the December 1977 issue. 454 F.Supp. at 296–301. Judge Freeman also declared that the January 1978 issue of Penthouse was not obscene, and he declared that McAuliffe must apply the "as a whole" qualification of *Miller* in applying the obscenity laws. 454 F.Supp. at 304.

Judge Freeman's two cases were considered together on appeal in *Penthouse International, Ltd. v. McAuliffe*, 610 F.2d 1353 (5th Cir.1980). The court of appeals upheld the finding of an improper prior restraint in *Penthouse I*, affirmed its grant of injunctive and declaratory relief, and did not reach the issue whether the August 1977 Penthouse was obscene. 610 F.2d at 1362. Reviewing *Penthouse II*, the court of appeals reversed in part and held that the January 1978 Penthouse was in fact obscene. 610 F.2d at 1373.

The third case between these parties in federal court concerned the film *Caligula.*

Judge Freeman heard that case also; sitting with an advisory jury, he ruled that the film was not obscene. *Penthouse International, Ltd. v. McAuliffe*, Civil Action No. C80–2172A, slip op. (N.D.Ga. May 15, 1981) (*Caligula*). Judge Freeman found, however, that the film's overwhelming depictions of violence, cruelty, and sexual behavior would inhibit rather than appeal to a prurient interest in sex. Slip op. at 7–9. He also found that the film, taken as a whole, lacked serious literary and scientific value, but contained serious artistic and political value. Slip op. at 15. A panel of the Eleventh Circuit reversed in part and affirmed in part, 702 F.2d 925 (11th Cir. 1983). The court of appeals reheard the case *in banc*, thus vacating the panel opinion, *cf.* 11th Cir.R. 26(k); and because it divided equally as to the proper disposition of the case, it affirmed the district court by operation of law. 717 F.2d 517 (11th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1615, 80 L.Ed.2d 144 (1984).

## III. LEGAL STANDARDS

There are four prerequisites to the grant of preliminary injunctive relief: (1) the movant is substantially likely to prevail on the merits; (2) the movant will suffer irreparable injury unless the injunction issues; (3) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir.1984).

The Georgia statute regulating the distribution of obscene materials states, in pertinent part:

(b) Material is obscene if:

(1) To the average person, applying contemporary community standards, taken as a whole, it predominantly appeals to the prurient interest, that is, a shameful or morbid interest in nudity, sex, or excretion;

(2) The material taken as a whole lacks serious literary, artistic, political, or scientific value; and

(3) The material depicts or describes, in a patently offensive way, sexual conduct specifically defined in subparagraphs (A) through (E) below:

(A) Acts of sexual intercourse, heterosexual or homosexual, normal or perverted, actual or simulated;

(B) Acts of masturbation;

(C) Acts involving excretory functions or lewd exhibition of the genitals;

(D) Acts of bestiality or the fondling of sex organs of animals; or

(E) Sexual acts of flagellation, torture, or other violence indicating a sadomasochistic sexual relationship;

. . . . .

(d) Material not otherwise obscene may be obscene under this Code section if the distribution thereof, the offer to do so, or the possession with intent to do so is a commercial exploitation of erotica solely for the sake of their prurient appeal.

O.C.Ga.Ann. § 16–12–80 (Michie 1984).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

There are two elements pertaining to success on the merits that plaintiff must establish: that the Court has jurisdiction over the case enabling the Court to reach the merits, and that the periodical at issue is not obscene. As movant, plaintiff has the burden of proof as to each element.[4]

1. Jurisdiction of the federal courts

a. September 1984 Penthouse

*Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), held that there was a national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances. A companion case to *Younger*, *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), held that declar-

---

**4.** As to the burden and standard of proof on the question of obscenity, see *infra* page 1195–1196.

atory relief was also improper when a prosecution involving the challenged statute is pending in state court at the time the federal suit is initiated.

■■■ These decisions reflect two basic concerns. First is a principle of equity that a criminal proceeding cannot be enjoined by showing the existence of a valid defense. Second is a principle of federalism, that federal courts must not interfere in state judicial processes because state courts of general jurisdiction are authorized and competent, as front-line fora, to adjudicate all relevant questions of both state and federal law. *See Younger,* 401 U.S. at 43–44, 91 S.Ct. at 750–751.

■ *Younger* established that particular equitable considerations may make it appropriate, in certain cases, for a federal court to take action despite the usual rule of non-interference. Bad faith, harassment, and unusual situations may justify federal court action. As the Supreme Court stated in *Perez v. Ledesma,* 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701 (1971):

> Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.

On the other hand, *Younger* noted that "the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action." 401 U.S. at 51, 91 S.Ct. at 754.

This case, which concerns enforcement of the obscenity statutes against both the September 1984 and October 1984 issues of Penthouse, comes to the Court in a mixed procedural posture. The Solicitor General has already commenced enforcement proceedings with regard to the September issue, but not with regard to the October one. Thus only half the case falls within the domain of *Younger.*

The first issue the Court must determine from the evidence is whether there exists bad faith, harassment, or such unusual circumstances that should justify federal interference in the accusations against distribution of the September issue.

Plaintiff suggests four examples of Webb's bad faith and several unusual circumstances in the case. Plaintiff first claims that Webb filed an accusation that is legally void because of the impossibility of service, and that the filing of a void accusation constitutes bad faith. The statute authorizing service of an accusation, O.C.Ga. Ann. § 17–7–92 (Michie 1982), states, in pertinent part:

> Whenever an indictment, special presentment, or accusation against a corporation doing business in this state is returned or filed in any court having jurisdiction over the offense, the clerk of the court shall issue an original and copy notice to the defendant corporation of the filing of the indictment, special presentment, or accusation, which copy notice shall be served by a sheriff upon any officer of the corporation who is found in his county; or, if there is no such officer in his county, then service shall be upon any agent of the corporation.

Plaintiff claims that the statute does not authorize service against it, a foreign corporation without an agent for service of process in Georgia; it further contends that if the statute does in fact authorize service, it is unconstitutional because it denies due process.

The Court observes that the scope of O.C.Ga.Ann. § 17–7–92 has not been determined by state courts;[5] for that reason the Court will consider only whether the statute, as applied to Penthouse, is so clearly

---

5. Among obvious questions of construction are whether "any agent of the corporation" means only an agent authorized to receive service of process; whether an agent (as opposed to an officer) may be served outside a sheriff's county; and whether plaintiff is "doing business" within Georgia. Those questions are appropriate for the state court to determine in the enforcement proceeding.

unconstitutional that the Solicitor General's reliance upon it would constitute bad faith.

The Second Circuit has adopted the " 'modern notion' that where a person has sufficiently caused adverse consequences within a state, he may be subjected to its judicial jurisdiction so long as he is given adequate notice and an opportunity to be heard." *Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983). The court relied upon section 50 of the American Law Institute's Restatement (Second) of Conflict of Laws (1971), which states:

> A state has power to exercise judicial jurisdiction over a foreign corporation which causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of these effects and of the corporation's relationship to the state makes the exercise of such jurisdiction unreasonable.

And, as the Second Circuit noted in an earlier case in a similar context, "the principal function of service of process is rather to give notice and opportunity to be heard, which can be done by appropriate methods of service outside the state." *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir.1972). *See also McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The Court agrees with those decisions and therefore concludes that Solicitor General Webb's reliance upon O.C. Ga.Ann. § 17-7-92 does not constitute bad faith.

Plaintiff also claims that Webb violated an order of Judge Freeman in *Penthouse I,* 436 F.Supp. 1241 (N.D.Ga.1977). That order permanently enjoined Webb's predeces-sor, Hinson McAuliffe, from making further arrests under Ga.Code Ann. § 26-2101 (now O.C.Ga.Ann. § 16-12-80 (Michie 1984)) for the sale of the August 1977 Penthouse without first obtaining arrest warrants. 436 F.Supp. at 1256. Judge Freeman added two observations. First, he noted: "While this court's jurisdiction over the instant publications is limited to a single issue thereof ... it is hoped that ... a word to the wise will be sufficient." *Id.* at 1256 n. 31. He also stated: "[I]t should be noted that we do not decide that Mr. McAuliffe's office may make no more arrests under Ga.Code § 26-2101 concerning subsequent issues of the subject publications. Rather, we decide only that if he chooses to do so he must follow the previously enunciated constitutional guidelines." 436 F.Supp. at 1256.

Webb cannot have violated the letter of that order because it was confined to the August 1977 issue. Moreover, there is no evidence before this Court that Webb violated even the spirit of Judge Freeman's order. His office has made no arrests; furthermore, he has obtained two "Jane Doe" warrants after a magistrate's determination of probable obscenity of the September 1984 issue.[6] He has not engaged in the sort of widespread harassment by his predecessor that amounted to an informal system of prior restraint and constructive seizure. *Cf. id.* at 1251–1256. As a matter of fact, from the limited evidence before the Court, it is hard to see how Webb could have done anything less.

Plaintiff's third example of bad faith consists of the coincidence that the arrest warrants and accusation were issued on August 8, 1984, the same day that the Solicitor General's lawyer paid court costs and

---

**6.** Plaintiff has also suggested that Webb's failure to obtain a finding of probable obscenity in the course of making an accusation violates Judge Freeman's order, is unconstitutional, and demonstrates bad faith. The Court disagrees. There is no requirement of, much less any procedure for obtaining, a finding of probable obscenity in the course of filing an accusation. Such a finding must precede an *arrest,* but a corporation such as plaintiff is not subject to arrest, and no arrest warrant has been sought against plaintiff. Furthermore, there was a finding of probable obscenity by a magistrate, in connection with the two arrest warrants already issued, when Webb filed the accusation. Plaintiff clutches at straws in claiming that a prosecutor must make an accusation (to obtain a probable obscenity determination) before filing another accusation (to commence prosecution).

thus concluded the litigation over the film Caligula. Webb testified that the payment of costs on that date by the county commission culminated a lengthy bureaucratic process of obtaining a check, and that the payment and the accusation were unrelated. Although there is no independent evidence of Webb's motivation, the Court is satisfied that the coincidence does not show any bad faith.

Plaintiff shows, as a purported fourth example of bad faith, that the Solicitor General has failed to prosecute distribution of other magazines that are arguably less clearly protected under the first and fourteenth amendments than Penthouse. To that end plaintiff introduced copies of two other magazines sold in Fulton County that have not been prosecuted. The Court would place little weight upon such a claim of selective prosecution without stronger evidence, because all prosecution is to some extent selective. In this case the Court accords even less weight to the claim because, upon reviewing the magazines, it could discern rational reasons for prosecuting Penthouse and not the others.

■ It does not amount to bad faith for a prosecutor to make distribution of obscene materials a high priority in his or her prosecutorial agenda. Nor does it amount to bad faith to prosecute a defendant that pretends to be in the mainstream and not at the extreme of sexually oriented publications. Nor is there bad faith in prosecuting close cases, especially where previous cases have not always been decided in favor of the publisher. Plaintiff must show harassment or other clear evidence that the Solicitor General has abused his discretion; and plaintiff has not done so. There is no showing here that Webb undertook anything other than to carry out his stated purpose, and official obligation, of enforcing the state's criminal statutes.

Aside from the specific claims of bad faith, Penthouse claims unusual circumstances that justify federal intervention. Plaintiff claims that the dominant position of ANA in local periodical distribution, combined with ANA's apparent sensitivity to controversy, shuts Penthouse completely out of the county. For this reason, plaintiff asks the Court not only to block the accusation against it, but also to interfere with the accusation against Elson's News and Gift Shops and with the possible arrests of its employees. Plaintiff claims that, by selecting the crucial link of Penthouse's distribution system in the county—Edward Elson—for prosecution, the Solicitor General has so blocked all sales of the magazine as to constitute a prior restraint.

Plaintiff also claims that its long history of disputes over obscenity with the Fulton County Solicitor General requires federal intervention. Although there have indeed been several lawsuits brought by both parties, the last attempted prosecution for obscenity of an issue of Penthouse occurred in 1977; thus it appears that the disputes are episodic rather than continuing. The history of the disputes includes at least one occasion when an issue of Penthouse was adjudicated to be obscene, *Penthouse International, Ltd. v. McAuliffe*, 610 F.2d 1353, 1372–1373 (5th Cir.1980), *cert. dismissed*, 447 U.S. 931, 100 S.Ct. 3031, 65 L.Ed.2d 1131 (1980), and another occasion when a film produced by plaintiff drew an even split within the Eleventh Circuit on appeal from a finding of no obscenity. *Penthouse International, Ltd. v. McAuliffe*, 717 F.2d 517 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1615, 80 L.Ed.2d 144 (1984).

Plaintiff claims that the continuing threat of further arrests chills the distribution of future issues of Penthouse; but any threat of further arrest in this case comes from the awareness of plaintiff and its distributors that they act at the margin of, or outside, the law. The Solicitor General testified under oath at the hearing that he had made no plans concerning further prosecution.

■ None of these circumstances, either individually or taken together, warrant an exception to the *Younger* doctrine. As *Younger* itself noted, the "chilling effect" of a prosecution alone does not create an unusual circumstance. 401 U.S. at 51, 91

S.Ct. at 754. Further, plaintiff's part in the history of prior cases is not impeccable, because at least one prior issue was obscene; it therefore does not have the "clean hands" necessary to claim that history as an equitable consideration justifying federal interference. Third, the selection of Elson's company as a target of prosecution was legitimate, precisely because Elson is Penthouse's major distributor. The apparent special sensitivity of Elson and his companies to controversy over obscenity, long known to plaintiff, *cf. Penthouse II*, 454 F.Supp. 289, 299, 301 n. 13 (N.D.Ga.1978), could have been taken into account by plaintiff when fashioning a distribution network. Because plaintiff has knowingly created its own hardship by retaining this distributor,[7] it may not rely upon that hardship as an equitable consideration justifying federal court intrusion into a state proceeding.

Because the Court concludes that the prosecution of distribution of the September 1984 issue of Penthouse involves no bad faith and that no unusual circumstances justify federal intervention in a state enforcement proceeding, the Court, at least as a preliminary matter, determines that equitable restraint is required under *Younger v. Harris*. As a consequence, there is not a substantial likelihood that plaintiff will even reach, much less prevail on, the merits of its action as to the September 1984 issue of Penthouse.

#### b. October 1984 Penthouse

■ There is no state enforcement action yet concerning the October 1984 issue. When no state court enforcement proceeding has begun, there may be no sufficient "case or controversy" to authorize federal court jurisdiction under either the Declaratory Judgment Act, 28 U.S.C. § 2201, or Article III of the U.S. Constitution. *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), established, however, that "federal declaratory relief is not precluded when no state prosecution is

pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute, whether an attack is made on the constitutionality of the statute on its face or as applied." 415 U.S. at 475, 94 S.Ct. at 1224.

Even if there exists somewhere a case or controversy between plaintiff and defendant regarding the October 1984 issue, that case or controversy has not entered this Court. Plaintiff's complaint seeks no ultimate relief, by way of either injunction or declaration, regarding the October issue; the request for ultimate relief is confined to questions concerning the September 1984 issue. As a result, the Court is without jurisdiction to pass upon the merits of the October 1984 issue.

#### 2. Nature of the Magazines

#### a. September 1984 Penthouse

Even if the Court were to decide that it was proper for a federal court to interfere with the state court proceedings, it would not do so in this case because plaintiff has not shown a substantial likelihood of prevailing on the merits of its action for a declaration that the September 1984 issue is not obscene.

The Court first addresses the burden and standard of proof that would apply to plaintiff's action. Plaintiff urges that it comes into Court protected by a presumption that the magazines are not obscene, and that the presumption may be defeated only if the materials are found obscene "beyond a reasonable doubt," citing the standard applied by Judge Freeman in the *Caligula* case. *See* Trial transcript at 1540, *Penthouse International, Ltd. v. McAuliffe*, Civil Action no. C80–2172A, (N.D.Ga. May 15, 1981). On its theory, all plaintiff would have to do in its affirmative action for a declaratory judgment is to show that there is a reasonable doubt that the issues are obscene. Plaintiff thus wants to have its cake and eat it too: it wants to force Webb to prove his case as a defendant instead of

---

**7.** Plaintiff has also apparently aggravated that hardship by refusing to make arrangements

with ANA that might have resulted in renewed distribution. *See supra* page 1189 note 3.

as a prosecutor, by the criminal standard instead of by a preponderance of the evidence, in a federal civil action instead of a state criminal prosecution.

■ Plaintiff's suggestion is untenable. The Supreme Court has squarely held that the "beyond reasonable doubt" standard is not required in a civil proceeding concerning obscenity. *Cooper v. Mitchell Brothers' Santa Ana Theater*, 454 U.S. 90, 102 S.Ct. 172, 70 L.Ed.2d 262 (1981) (per curiam).

Nor does the state bear the burden of proof. The state has not come into this court; plaintiff has. Because it seeks affirmative and anticipatory relief, which in any event should be considered only in extraordinary circumstances, it must accept the burden that is placed on every civil plaintiff. The Court therefore holds that, as the party seeking relief, plaintiff must carry the burden of proof and meet the usual, preponderance-of-the-evidence standard for civil litigation.[8]

In light of the standard just discussed, plaintiff must, in order to obtain a preliminary injunction, show that it is substantially likely to prevail—by a preponderance of the evidence—on the merits at the ultimate determination.

*Miller v. California* establishes that, in a case involving obscene materials,

[t]he basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24, 93 S.Ct. at 2615 (citations omitted). The Court went on to offer examples of what a state statute could permissibly define for regulation under category (b) above:

(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
(b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

413 U.S. at 25, 93 S.Ct. at 2615.

Any portions of O.C.Ga.Ann. § 16–12–80(b) that would apply to plaintiff with regard to the September or October 1984 issues of Penthouse would accord with the *Miller* standard.

The Court will examine the September 1984 issue of Penthouse, analyzing first its depictions and descriptions of sexual conduct; second, its appeal to prurient interest; and third, its literary, artistic, political, or scientific value.

*Depictions and descriptions*

■ There are five photo features in the magazine that contain 108 photographs of women in varying degrees of nudity; only 21 photos in those series portray women without exposed breasts, buttocks, or genitals. Nine of the photographs display lesbian cunnilingus, either simulated or actual. Seven photographs display or allude to masturbation: five show a finger on or near the clitoris, one shows a finger near the anus, and one shows a finger clearly within the vagina. Among the other photographs in the five series are sixteen showing women's legs spread in such a way as to expose their genitals, two that feature women spreading their labia open with their fingers to reveal more, and six that are close-up photographs showing nothing but women's groins. The Court finds that these photographs depict sexual conduct

**8.** Plaintiff claims that publications are presumed to be protected by the First Amendment. That is true in a criminal prosecution, merely because a defendant is presumed to be innocent until proved otherwise; but in an anticipatory action like this that presumption does not apply.

It is true that prior restraints are presumptively invalid, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963), but there is no evidence of prior restraint in this case.

and lewd exhibition in a patently offensive way forbidden by O.C.Ga.Ann. § 16–12–80 within the guidelines of *Miller.*

■ Patently offensive written descriptions, even without photographs, may be sufficient to render a publication obscene. *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973). Having found that the September 1984 issue contains patently offensive photographic depictions of sexual conduct, the Court need not dwell on whether the magazine also contains patently offensive written descriptions as well, except to say that "Penthouse Forum," "Women's Forum," and "Call Me Madam," analyzed in the next section, contain an abundance of them.

*Appeal to prurient interest*

■ An examination of the text of the issue follows, broken down by categories. The length of each item is approximate. Not included in the analysis are the five series of nude photographs, totaling 63 pages, discussed above.

Letters:

*Penthouse Forum:* readers' narratives of sexual behavior in seven letters, detailing four acts of fellatio, four of vaginal intercourse, two of anal intercourse, two of cunnilingus, and one of masturbation, not to mention one act of "intercourse" with a "rubber love doll" and sundry other activities. (3½ pages)

*Women's Forum:* one letter narrating vaginal and anal intercourse as well as cunnilingus. (1½ pages)

*Pet Forum:* fan mail to "Penthouse Pets" from readers. (1 page)

*Feedback:* letters from readers about Penthouse's editorial content. (4 pages)

*Call Me Madam:* two letters seeking advice on stimulating libido, one letter seeking advice on sexy lingerie, and two letters narrating sexual activities. (3 pages)

Columns:

*Power Game:* on how to use power (1 page)

*Men's Rights:* on federal divorce legislation (1 page)

*Vietnam Veterans Adviser:* on veterans' benefits (1 page)

*Advise and Consent:* on Soviet aggression (2 pages)

Reviews, trivia, miscellaneous:

*View from the top:* on sexual mores (1 page)

*Computers:* review (1 page)

*Sounds:* review (1 page)

*Home Video:* review (includes "adult" and standard videos) (1 page)

*Films:* review (standard films) (1 page)

*Nutrition and Fitness:* advice (1 page)

*Food & Wine:* restaurant review (1 page)

*Fast Forward:* auto review (2 pages)

*Hard Times:* humorous compendium of news items (3 pages)

*Games:* trivia quiz about Penthouse (2 pages)

*Are You Really Special?:* personality test (2 pages)

Non-fiction articles:

*The Friends of Robert Vesco:* on international drug trafficking (6 pages)

*Oh Boy:* profile of Boy George (6 pages)

*Champ:* profile of Muhammad Ali (2 pages)

*Getting It All Together:* exercise advice by John Travolta (3 pages)

Interview:

*John and Yoko:* 1971 interview with John Lennon and Yoko Ono (5 pages)

Fiction article:

*Fallen Hero:* novel excerpt about firefighting drama (4 pages)

Cartoon features:

*Sweet Chastity:* social-political satire (6 pages)

*In the Beginning:* parody of Penthouse (5 pages)

*Hofmekler's People:* political caricature (2 pages).

Having reviewed the contents of the September 1984 Penthouse, the Court concludes that, taken as a whole, the magazine predominantly appeals to the prurient interest. Even though there are items that concern topics other than sex, the magazine's overwhelming effect, obviously planned, is to create sexual excitement and stimulation, to scratch the itch—or to create the itch itself—of prurient interest.

*Literary, artistic, political, or scientific value*

 The Court also preliminarily concludes that, taken as a whole, the magazine has no serious literary, artistic, political, or scientific value. There may be some literary value to the fiction article, some slight artistic value to one cartoon, and some slight political value to three items, but the Court questions whether any of these taken alone has serious value; the Court also determines that the magazine, *taken as a whole*, has no serious literary, artistic, political, or scientific value.

Because the Court finds that the September 1984 Penthouse meets all three criteria of the *Miller* test and falls within the Georgia obscenity distribution statute, O.C.Ga. Ann. § 16–12–80, the Court must conclude that plaintiff has shown no substantial likelihood of prevailing on the merits of its action for a declaration that the September 1984 Penthouse is not obscene.[9]

b. October 1984 Penthouse

As noted earlier, *see supra* pages 1195, the complaint makes no claim for relief as to the October 1984 issue, and as a result the Court is powerless to consider the merits of such a claim. Nevertheless, because the omission of a claim for relief may have been an oversight, and because parties to expedited preliminary motions deserve clear guidance, the Court adds the following observation. If a claim for relief as to the October 1984 issue were properly before the Court, the Court would find that plaintiff would be even less likely to prevail on the merits than with regard to the September 1984 magazine: the October issue contains less material than the September issue that could arguably be deemed to have value, while it also contains patently offensive depictions of sexual conduct and predominantly appeals to prurient interest.

B. *Other Prerequisites*

Because the Court finds that plaintiff has failed to show a substantial likelihood of prevailing on the merits, the Court need not consider whether plaintiff has satisfied the other prerequisites for preliminary injunctive relief.

V. CONCLUSION

Because the circumstances of this case do not justify federal interference in the pending state enforcement proceeding as to the September 1984 Penthouse, because plaintiff has not made a claim for ultimate relief as to the October 1984 Penthouse, and because, in any event, plaintiff has not shown that it is likely to prevail in showing that either the September 1984 Penthouse or the October 1984 Penthouse is not obscene, the Court DENIES plaintiff's motion to enjoin enforcement of the Georgia obscenity distribution statute, O.C.Ga.Ann. § 16–12–80, with respect to the September and October 1984 issues of Penthouse.

---

**9.** The Court recognizes that any attempt to control expression poses a potential threat to democracy. *See Miller v. California,* 413 U.S. at 23, 93 S.Ct. at 2614. But a state may properly exercise its police powers to regulate obscene material in order to protect legitimate state interests, including "the interest of the public in the quality of life and the total community environment ... and, possibly, the public safety itself." *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 57–58, 93 S.Ct. 2628, 2635–2636, 37 L.Ed.2d 446 (1973). Even if the boundary between protected and unprotected expression is not clear, it nevertheless exists, *cf. Miller,* 413 U.S. at 26–30, 93 S.Ct. at 2616–2618; and plaintiff has crossed that boundary. The Court expresses no personal opinion on matters of taste or morality. The Court's function is to decide whether the Constitution forbids defendant to apply the law enacted by Georgia's elected legislature to the September 1984 Penthouse. The legislature has power, limited only by the Constitution, to decide whether or not state regulation of obscenity is appropriate or desirable. The role of a federal court is solely to enforce the federal constitutional limits to the legislature's power.